# PENNELL ET AL. *v.* CITY OF SAN JOSE ET AL.

No. 86–753.   Argued November 10, 1987—Decided February 24, 1988

2

REHNQUIST, C. J., delivered the opinion of the Court, in which BRENNAN, WHITE, MARSHALL, BLACKMUN, and STEVENS, JJ., joined. SCALIA, J., filed an opinion concurring in part and dissenting in part, in which O'CONNOR, J., joined, *post*, p. 15. KENNEDY, J., took no part in the consideration or decision of the case.

*Harry D. Miller* argued the cause for appellants. With him on the briefs were *Burch Fitzpatrick* and *Gary E. Rosenberg.*

*Joan R. Gallo* argued the cause for appellees. With her on the brief was *George Rios.**

---

*Briefs of *amici curiae* urging reversal were filed for the California Association of Realtors by *William M. Pfeiffer;* for the National Apartment Association et al. by *Jon D. Smock, Wilbur H. Haines III,* and *Jeffrey J. Gale;* for the National Association of Realtors by *William D. North;* for the National Multi Housing Council by *Lawrence B. Simons* and *Michael E. Fine;* for the Rent Stabilization Association of New York City, Inc., et al. by *Erwin N. Griswold;* and for the Washington Legal Foundation by *Daniel J. Popeo, Paul D. Kamenar,* and *Todd Natkin.*

Briefs of *amici curiae* urging affirmance were filed for the American Civil Liberties Union et al. by *John A. Powell, Steven R. Shapiro, Helen Hershkoff, Paul L. Hoffman,* and *Mark Rosenbaum;* for the American Federation of Labor and Congress of Industrial Organizations by *Robert M. Weinberg* and *Laurence Gold;* for the Asian Law Alliance et al. by *Brenton Rogozen;* for the Center for Constitutional Rights by *Frank E. Deale;* for the National Housing Law Project by *David B. Bryson;* for the National Institute of Municipal Law Officers by *William I. Thornton, Jr., Roger F. Cutler, Roy D. Bates,* and *William H. Taube;* and for the U. S. Conference of Mayors et al. by *Benna Ruth Solomon* and *H. Bartow Farr III.*

Briefs of *amici curiae* were filed for the city of Santa Monica et al. by *Joseph Lawrence, Karl M. Manheim, Joel M. Levy, Hadassa K. Gilbert, Manuela Albuquerque, Raymond E. Ott, Mary Jo Levinger, Marc G. Hynes, Jayne W. Williams, K. Duane Lyders, Louise H. Renne, Roger T. Picquet, Steven A. Amerikaner, Mark G. Sellers,* and *John M. Powers;* for the Competitive Enterprise Institute by *Sam Kazman;* and for the National Association of Home Builders et al. by *Gus Bauman.*

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

This case involves a challenge to a rent control ordinance enacted by the city of San Jose, California, that allows a hearing officer to consider, among other factors, the "hardship to a tenant" when determining whether to approve a rent increase proposed by a landlord. Appellants Richard Pennell and the Tri-County Apartment House Owners Association sued in the Superior Court of Santa Clara County seeking a declaration that the ordinance, in particular the "tenant hardship" provisions, are "facially unconstitutional and therefore . . . illegal and void." The Superior Court entered judgment on the pleadings in favor of appellants, sustaining their claim that the tenant hardship provisions violated the Takings Clause of the Fifth Amendment, as made applicable to the States by the Fourteenth Amendment. The California Court of Appeal affirmed this judgment, 154 Cal. App. 3d 1019, 201 Cal. Rptr. 728 (1984), but the Supreme Court of California reversed, 42 Cal. 3d 365, 721 P. 2d 1111 (1986), each by a divided vote. The majority of the Supreme Court rejected appellants' arguments under the Takings Clause and the Equal Protection and Due Process Clauses of the Fourteenth Amendment; the dissenters in that court thought that the tenant hardship provisions were a "forced subsidy imposed on the landlord" in violation of the Takings Clause. Id., at 377, 721 P. 2d, at 1119. On appellants' appeal to this Court we postponed consideration of the question of jurisdiction, 480 U. S. 905 (1987), and now having heard oral argument we affirm the judgment of the Supreme Court of California.

The city of San Jose enacted its rent control ordinance (Ordinance) in 1979 with the stated purpose of

"alleviat[ing] some of the more immediate needs created by San Jose's housing situation. These needs include but are not limited to the prevention of excessive and unreasonable rent increases, the alleviation of undue hard-

ships upon individual tenants, and the assurance to landlords of a fair and reasonable return on the value of their property." San Jose Municipal Ordinance 19696, § 5701.2.[1]

At the heart of the Ordinance is a mechanism for determining the amount by which landlords subject to its provisions may increase the annual rent which they charge their tenants. A landlord is automatically entitled to raise the rent of a tenant in possession[2] by as much as eight percent; if a tenant objects to an increase greater than eight percent, a hearing is required before a "Mediation Hearing Officer" to determine whether the landlord's proposed increase is "reasonable under the circumstances." The Ordinance sets forth a number of factors to be considered by the hearing officer in making this determination, including "the hardship to a tenant." § 5703.28(c)(7). Because appellants concentrate their attack on the consideration of this factor, we set forth the relevant provision of the Ordinance in full:

"5703.29. Hardship to Tenants. In the case of a rent increase or any portion thereof which exceeds the standard set in Section 5703.28(a) or (b), then with respect to such excess and whether or not to allow same to be part of the increase allowed under this Chapter, the Hearing Officer shall consider the economic and financial hardship imposed on the present tenant or tenants of the unit or units to which such increases apply. If, on balance, the Hearing Officer determines that the proposed increase

---

[1] In order to be consistent with the decisions below, we refer throughout this opinion to the sections of the Ordinance as originally designated. We note, however, that the San Jose Municipal Code has recently been recodified and the Ordinance now appears at Chapter 17.23 of the new Code.

[2] Under § 5703.3, the Ordinance does not apply to rent or rent increases for new rental units first rented after the Ordinance takes effect, § 5703.3 (a), to the rental of a unit that has been voluntarily vacated, § 5703.3(b)(1), or to the rental of a unit that is vacant as a result of eviction for certain specified acts, § 5703.3(b)(2).

constitutes an unreasonably severe financial or economic hardship on a particular tenant, he may order that the excess of the increase which is subject to consideration under subparagraph (c) of Section 5703.28, or any portion thereof, be disallowed. Any tenant whose household income and monthly housing expense meets [certain income requirements] shall be deemed to be suffering under financial and economic hardship which must be weighed in the Hearing Officer's determination. The burden of proof in establishing any other economic hardship shall be on the tenant."

If either a tenant or a landlord is dissatisfied with the decision of the hearing officer, the Ordinance provides for binding arbitration. A landlord who attempts to charge or who receives rent in excess of the maximum rent established as provided in the Ordinance is subject to criminal and civil penalties.

Before we turn to the merits of appellants' contentions we consider the claim of appellees that appellants lack standing to challenge the constitutionality of the Ordinance. The original complaint in this action states that appellant Richard Pennell "is an owner and lessor of 109 rental units in the City of San Jose." Appellant Tri-County Apartment House Owners Association (Association) is said to be "an unincorporated association organized for the purpose of representing the interests of the owners and lessors of real property located in the City of San Jose." App. 2–3. The complaint also states that the real property owned by appellants is "subject to the terms of" the Ordinance. But, appellees point out, at no time did appellants allege that either Pennell or any member of the Association has "hardship tenants" who might trigger the Ordinance's hearing process, nor did they specifically allege that they have been or will be aggrieved by the determination of a hearing officer that a certain proposed rent increase is unreasonable on the ground of tenant hardship. As appellees put it, "[a]t this point in time, it is speculative"

whether any of the Association's members will be injured in fact by the Ordinance's tenant hardship provisions. Thus, appellees contend, appellants lack standing under either the test for individual standing, see, *e. g.*, *Valley Forge Christian College* v. *Americans United for Separation of Church & State, Inc.*, 454 U. S. 464, 472 (1982) (individual standing requires an "'actual injury redressable by the court'"), or the test for associational standing, see *Hunt* v. *Washington Apple Advertising Comm'n*, 432 U. S. 333, 343 (1977) (an association has standing on behalf of its members only when "its members would otherwise have standing to sue in their own right").[3]

We must keep in mind, however, that "application of the constitutional standing requirement [is not] a mechanical exercise," *Allen* v. *Wright*, 468 U. S. 737, 751 (1984), and that when standing is challenged on the basis of the pleadings, we "accept as true all material allegations of the complaint, and . . . construe the complaint in favor of the complaining party," *Warth* v. *Seldin*, 422 U. S. 490, 501 (1975); see also *Gladstone, Realtors* v. *Village of Bellwood*, 441 U. S. 91, 109 (1979). Here, appellants specifically alleged in their complaint that appellants' properties are "subject to the terms of" the Ordinance, and they stated at oral argument that the Association represents "most of the residential unit owners in the city and [has] many hardship tenants," Tr. of Oral Arg. 42; see also *id.*, at 7; Reply Brief for Appellants 2.

---

[3] Our cases also impose two additional requirements for associational or representational standing: the interests the organization seeks to protect must be "germane to the organization's purpose," *Hunt*, 432 U. S., at 343, and "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit," *ibid.* See also *Automobile Workers* v. *Brock*, 477 U. S. 274, 281–282 (1986). Both of these requirements are satisfied here. The Association was "organized for the purpose of representing the interests of the owners and lessors of real property" in San Jose in this lawsuit, App. 3, and the facial challenge that the Association makes to the Ordinance does not require the participation of individual landlords.

Accepting the truth of these statements, which appellees do not contest, it is not "unadorned speculation," *Simon* v. *Eastern Kentucky Welfare Rights Organization*, 426 U. S. 26, 44 (1976), to conclude that the Ordinance will be enforced against members of the Association. The likelihood of enforcement, with the concomitant probability that a landlord's rent will be reduced below what he or she would otherwise be able to obtain in the absence of the Ordinance, is a sufficient threat of actual injury to satisfy Art. III's requirement that "[a] plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Babbitt* v. *Farm Workers*, 442 U. S. 289, 298 (1979).[4]

This said, we recognize that the record in this case leaves much to be desired in terms of specificity for purposes of determining the standing of appellants to challenge this Ordinance. Undoubtedly this is at least in part a reflection of the fact that the case originated in a state court where Art. III's proscription against advisory opinions may not apply. We strongly suggest that in future cases parties litigating in this Court under circumstances similar to those here take pains to supplement the record in any manner necessary to enable us to address with as much precision as possible any question of standing that may be raised.

Turning now to the merits, we first address appellants' contention that application of the Ordinance's tenant hardship provisions violates the Fifth and Fourteenth Amend-

---

[4] Appellees also argue that Pennell lacks standing individually because in early 1987 he sold the properties he owned at the time the complaint in this action was filed. See Brief for Appellees 8. In a declaration submitted to the Court, Pennell admits that he sold these properties, but states that he recently repurchased and now owns one of the apartment buildings in San Jose that he formerly owned. Declaration of Richard Pennell ¶ 7. That property was and still is "subject to the Ordinance." *Id.*, ¶ 8. Because we conclude that the Association has standing and that therefore we have jurisdiction over this appeal, we find it unnecessary to decide whether Pennell's sale and repurchase of the property affects his standing here.

ments' prohibition against taking of private property for public use without just compensation. In essence, appellants' claim is as follows: § 5703.28 of the Ordinance establishes the seven factors that a hearing officer is to take into account in determining the reasonable rent increase. The first six of these factors are all objective, and are related either to the landlord's costs of providing an adequate rental unit, or to the condition of the rental market. Application of these six standards results in a rent that is "reasonable" by reference to what appellants contend is the only legitimate purpose of rent control: the elimination of "excessive" rents caused by San Jose's housing shortage. When the hearing officer then takes into account "hardship to a tenant" pursuant to § 5703.28(c)(7) and reduces the rent below the objectively "reasonable" amount established by the first six factors, this additional reduction in the rent increase constitutes a "taking." This taking is impermissible because it does not serve the purpose of eliminating excessive rents—that objective has already been accomplished by considering the first six factors—instead, it serves only the purpose of providing assistance to "hardship tenants." In short, appellants contend, the additional reduction of rent on grounds of hardship accomplishes a transfer of the landlord's property to individual hardship tenants; the Ordinance forces private individuals to shoulder the "public" burden of subsidizing their poor tenants' housing. As appellants point out, "[i]t is axiomatic that the Fifth Amendment's just compensation provision is 'designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" *First English Evangelical Lutheran Church of Glendale* v. *County of Los Angeles*, 482 U. S. 304, 318–319 (1987) (quoting *Armstrong* v. *United States*, 364 U. S. 40, 49 (1960)).

We think it would be premature to consider this contention on the present record. As things stand, there simply is no evidence that the "tenant hardship clause" has in fact ever

been relied upon by a hearing officer to reduce a rent below the figure it would have been set at on the basis of the other factors set forth in the Ordinance. In addition, there is nothing in the Ordinance requiring that a hearing officer in fact reduce a proposed rent increase on grounds of tenant hardship. Section 5703.29 does make it mandatory that hardship be considered—it states that "the Hearing Officer *shall* consider the economic hardship imposed on the present tenant"—but it then goes on to state that if "the proposed increase constitutes an unreasonably severe financial or economic hardship . . . he *may* order that the excess of the increase" be disallowed. § 5703.29 (emphasis added). Given the "essentially ad hoc, factual inquir[y]" involved in the takings analysis, *Kaiser Aetna* v. *United States*, 444 U. S. 164, 175 (1979), we have found it particularly important in takings cases to adhere to our admonition that "the constitutionality of statutes ought not be decided except in an actual factual setting that makes such a decision necessary." *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U. S. 264, 294–295 (1981). In *Virginia Surface Mining*, for example, we found that a challenge to the Surface Mining Control and Reclamation Act of 1977, 91 Stat. 447, 30 U. S. C. § 1201 *et seq.*, was "premature," 452 U. S., at 296, n. 37, and "not ripe for judicial resolution," *id.*, at 297, because the property owners in that case had not identified any property that had allegedly been taken by the Act, nor had they sought administrative relief from the Act's restrictions on surface mining. Similarly, in this case we find that the mere fact that a hearing officer is enjoined to consider hardship to the tenant in fixing a landlord's rent, without any showing in a particular case as to the consequences of that injunction in the ultimate determination of the rent, does not present a sufficiently concrete factual setting for the adjudication of the takings claim appellants raise here. Cf. *CIO* v. *McAdory*, 325 U. S. 472, 475–476 (1945) (declining to consider the validity of a state statute when the record did not

show that the statute would ever be applied to any of the petitioner's members).[5]

Appellants also urge that the mere provision in the Ordinance that a hearing officer may *consider* the hardship of the tenant in finally fixing a reasonable rent renders the Ordinance "facially invalid" under the Due Process and Equal Protection Clauses, even though no landlord ever has its rent diminished by as much as one dollar because of the application of this provision. The standard for determining whether a state price-control regulation is constitutional under the Due Process Clause is well established: "Price control is 'unconstitutional . . . if arbitrary, discriminatory, or demonstrably irrelevant to the policy the legislature is free to adopt . . . .'" *Permian Basin Area Rate Cases*, 390 U. S. 747, 769–770 (1968) (quoting *Nebbia* v. *New York*, 291 U. S. 502, 539 (1934)). In other contexts we have recognized that the government may intervene in the marketplace to regulate rates or prices that are artificially inflated as a result of the existence of a monopoly or near monopoly, see, *e. g.*, *FCC* v. *Florida Power Corp.*, 480 U. S. 245, 250–254 (1987) (approving limits on rates charged to cable companies for access to telephone poles); *FPC* v. *Texaco Inc.*, 417 U. S. 380, 397–398 (1974) (recognizing that federal regulation of the nat-

---

[5] For this reason we also decline to address appellants' contention that application of § 5703.28(c)(7) to reduce an otherwise reasonable rent increase on the basis of tenant hardship violates the Fourteenth Amendment's due process and equal protection requirements. See *Hodel* v. *Indiana*, 452 U. S. 314, 335–336 (1981) (dismissing as "premature" a due process challenge to the civil penalty provision of the Surface Mining Act because "appellees have made no showing that they were ever assessed civil penalties under the Act, much less that the statutory prepayment requirement was ever applied to them or caused them any injury").

Appellants and several *amici* also argue that the Ordinance's combination of lower rents for hardship tenants and restrictions on a landlord's power to evict a tenant amounts to a physical taking of the landlord's property. We decline to address this contention not only because it was raised for the first time in this Court, but also because it, too, is premised on a hearing officer's actually granting a lower rent to a hardship tenant.

ural gas market was in response to the threat of monopoly pricing), or a discrepancy between supply and demand in the market for a certain product, see, e. g., *Nebbia* v. *New York, supra,* at 530, 538 (allowing a minimum price for milk to offset a "flood of surplus milk"). Accordingly, appellants do not dispute that the Ordinance's asserted purpose of "prevent-[ing] excessive and unreasonable rent increases" caused by the "growing shortage of and increasing demand for housing in the City of San Jose," § 5701.2, is a legitimate exercise of appellees' police powers.[6] Cf. *Block* v. *Hirsh,* 256 U. S. 135, 156 (1921) (approving rent control in Washington, D. C., on the basis of Congress' finding that housing in the city was "monopolized"). They do argue, however, that it is "arbitrary, discriminatory, or demonstrably irrelevant," *Permian Basin Area Rate Cases, supra,* at 769–770, for appellees to attempt to accomplish the additional goal of reducing the burden of housing costs on low-income tenants by requiring that "hardship to a tenant" be considered in determining the amount of excess rent increase that is "reasonable under the circumstances" pursuant to § 5703.28.[7] As appellants put it, "[t]he objective of alleviating individual tenant hardship is . . . not a 'policy the legislature is free to adopt' in a rent control ordinance." Reply Brief for Appellants 16.

---

[6] Appellants do not claim, as do some *amici,* that rent control is *per se* a taking. We stated in *Loretto* v. *Teleprompter Manhattan CATV Corp.,* 458 U. S. 419 (1982), that we have "consistently affirmed that States have broad power to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation for all economic injuries that such regulation entails." *Id.,* at 440 (citing, *inter alia, Bowles* v. *Willingham,* 321 U. S. 503, 517–518 (1944)). And in *FCC* v. *Florida Power Corp.,* 480 U. S. 245 (1987), we stated that "statutes regulating the economic relations of landlords and tenants are not *per se* takings." *Id.,* at 252. Despite *amici*'s urgings, we see no need to reconsider the constitutionality of rent control *per se.*

[7] As we noted above, see n. 5, *supra,* to the extent that appellants' due process argument is based on the claim that the Ordinance forces landlords to subsidize individual tenants, that claim is premature and not presented by the facts before us.

We reject this contention, however, because we have long recognized that a legitimate and rational goal of price or rate regulation is the protection of consumer welfare. See, *e. g.*, *Permian Basin Area Rate Cases, supra,* at 770; *FPC* v. *Hope Natural Gas Co.,* 320 U. S. 591, 610–612 (1944) ("The primary aim of [the Natural Gas Act] was to protect consumers against exploitation at the hands of natural gas companies"). Indeed, a primary purpose of rent control is the protection of tenants. See, *e. g., Bowles* v. *Willingham,* 321 U. S. 503, 513, n. 9 (1944) (one purpose of rent control is "to protect persons with relatively fixed and limited incomes, consumers, wage earners . . . from undue impairment of their standard of living"). Here, the Ordinance establishes a scheme in which a hearing officer considers a number of factors in determining the reasonableness of a proposed rent increase which exceeds eight percent *and* which exceeds the amount deemed reasonable under either § 5703.28(a) or § 5703.28(b). The first six factors of § 5703.28(c) focus on the individual landlord—the hearing officer examines the history of the premises, the landlord's costs, and the market for comparable housing. Section 5703.28(c)(5) also allows the landlord to bring forth any other financial evidence—including presumably evidence regarding his own financial status—to be taken into account by the hearing officer. It is in only this context that the Ordinance allows tenant hardship to be considered and, under § 5703.29, "balance[d]" with the other factors set out in § 5703.28(c). Within this scheme, § 5703.28(c) represents a rational attempt to accommodate the conflicting interests of protecting tenants from burdensome rent increases while at the same time ensuring that landlords are guaranteed a fair return on their investment. Cf. *Bowles* v. *Willingham, supra,* at 517 (considering, but rejecting, the contention that rent control must be established "landlord by landlord, as in the fashion of utility rates"). We accordingly find that the Ordinance, which so carefully considers both the individual circumstances of the landlord and

14

the tenant before determining whether to allow an *additional* increase in rent over and above certain amounts that are deemed reasonable, does not on its face violate the Fourteenth Amendment's Due Process Clause.[8]

We also find that the Ordinance does not violate the Amendment's Equal Protection Clause. Here again, the standard is deferential; appellees need only show that the classification scheme embodied in the Ordinance is "rationally related to a legitimate state interest." *New Orleans* v. *Dukes*, 427 U. S. 297, 303 (1976). As we stated in *Vance* v. *Bradley*, 440 U. S. 93 (1979), "we will not overturn [a statute that does not burden a suspect class or a fundamental interest] unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislature's actions were irrational." *Id.*, at 97. In light of our conclusion above that the Ordinance's tenant hardship provisions are designed to serve the legitimate purpose of protecting tenants, we can hardly conclude that it is irrational for the Ordinance to treat certain landlords differently on the basis of whether or not they have hardship tenants. The Ordinance distinguishes between landlords because doing so furthers the purpose of ensuring that individual tenants do not suffer "unreasonable" hardship; it would be inconsistent to state that hardship is a legitimate factor to be considered but then hold that appellees could not tailor the Ordinance so that only legitimate hardship cases are redressed. Cf. *Woods* v. *Cloyd W. Miller Co.*, 333 U. S. 138, 145 (1948)

---

[8] The consideration of tenant hardship also serves the additional purpose, not stated on the face of the Ordinance, of reducing the costs of dislocation that might otherwise result if landlords were to charge rents to tenants that they could not afford. Particularly during a housing shortage, the social costs of the dislocation of low-income tenants can be severe. By allowing tenant hardship to be considered under § 5703.28(c), the Ordinance enables appellees to "fine tune" their rent control to take into account the risk that a particular tenant will be forced to relocate as a result of a proposed rent increase.

(Congress "need not control all rents or none. It can select those areas or those classes of property where the need seems the greatest"). We recognize, as appellants point out, that in general it is difficult to say that the landlord "causes" the tenant's hardship. But this is beside the point—if a landlord does have a hardship tenant, regardless of the reason why, it is rational for appellees to take that fact into consideration under § 5703.28 of the Ordinance when establishing a rent that is "reasonable under the circumstances."

For the foregoing reasons, we hold that it is premature to consider appellants' claim under the Takings Clause and we reject their facial challenge to the Ordinance under the Due Process and Equal Protection Clauses of the Fourteenth Amendment. The judgment of the Supreme Court of California is accordingly

*Affirmed.*

JUSTICE KENNEDY took no part in the consideration or decision of this case.

JUSTICE SCALIA, with whom JUSTICE O'CONNOR joins, concurring in part and dissenting in part.

I agree that the tenant hardship provision of the Ordinance does not, on its face, violate either the Due Process Clause or the Equal Protection Clause of the Fourteenth Amendment. I disagree, however, with the Court's conclusion that appellants' takings claim is premature. I would decide that claim on the merits, and would hold that the tenant hardship provision of the Ordinance effects a taking of private property without just compensation in violation of the Fifth and Fourteenth Amendments.

I

Appellants contend that any application of the tenant hardship provision of the San Jose Ordinance would effect an uncompensated taking of private property because that provision does not substantially advance legitimate state interests and because it improperly imposes a public burden on individ-

ual landlords. I can understand how such a claim—that a law applicable to the plaintiffs is, root and branch, invalid—can be readily rejected on the merits, by merely noting that at least some of its applications may be lawful. But I do not understand how such a claim can possibly be avoided by considering it "premature." Suppose, for example, that the feature of the rental ordinance under attack was a provision allowing a hearing officer to consider the race of the apartment owner in deciding whether to allow a rent increase. It is inconceivable that we would say judicial challenge must await demonstration that this provision has actually been applied to the detriment of one of the plaintiffs. There is no difference, it seems to me, when the facial, root-and-branch challenge rests upon the Takings Clause rather than the Equal Protection Clause.

The Court confuses the issue by relying on cases, and portions of cases, in which the Takings Clause challenge was not (as here) that the law in all its applications took property without just compensation, but was rather that the law's application in regulating the use of particular property so severely reduced the value of that property as to constitute a taking. It is in *that* context, and not (as the Court suggests) generally, that takings analysis involves an "essentially ad hoc, factual inquir[y]," *Kaiser Aetna* v. *United States*, 444 U. S. 164, 175 (1979). We said as much less than a year ago, and it is surprising that we have so soon forgotten:

> "In addressing petitioners' claim we must not disregard the posture in which this case comes before us. The District Court granted summary judgment to respondents only on the facial challenge to the Subsidence Act. The court explained that ' . . . *the only question before this court is whether the mere enactment of the statutes and regulations constitutes a taking.*' . . .
>
> "The posture of the case is critical because we have recognized an important distinction between a claim that the mere enactment of a statute constitutes a taking and

a claim that the particular impact of government action on a specific piece of property requires the payment of just compensation. This point is illustrated by our decision in *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U. S. 264 (1981), in which we rejected a preenforcement challenge to the constitutionality of the Surface Mining Control and Reclamation Act of 1977. . . . The Court [there] explained:

.            .            .            .            .

" ' "Because appellees" taking claim arose in the context of a facial challenge, it presented no concrete controversy concerning either application of the Act to particular surface mining operations or its effect on specific parcels of land. Thus, the only issue properly before the District Court and, in turn, this Court, is whether the "mere enactment" of the Surface Mining Act constitutes a taking. . . . The test to be applied in considering this facial challenge is straightforward. A statute regulating the uses that can be made of property effects a taking if it "denies an owner economically viable use of his land." . . . '

"Petitioners thus face an uphill battle in making a facial attack on the Act as a taking." *Keystone Bituminous Coal Assn.* v. *DeBenedictis*, 480 U. S. 470, 493–495 (1987).

While the battle was "uphill" in *Keystone*, we allowed it to be fought, and did not declare it "premature."

The same was true of the facial takings challenge in *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc.*, *supra*. It is remarkable that the Court should point to that case in support of its position, describing the holding as follows:

"In *Virginia Surface Mining*, for example, we found that a challenge to the Surface Mining Control and Reclamation Act . . . was 'premature,' . . . and 'not ripe for judi-

cial resolution,' . . . because the property owners in that case had not identified any property that had allegedly been taken by the Act, nor had they sought administrative relief from the Act's restrictions on surface mining." *Ante*, at 10.

But this holding in *Virginia Surface Mining* applied only to "the taking issue decided by the District Court," 452 U. S., at 297, which was the issue of the statute's validity *as applied*. Having rejected that challenge as premature, the Court then continued (in the language we quoted in *Keystone*):

"Thus, the only issue properly before the District Court and, in turn, this Court, is whether the 'mere enactment' of the Surface Mining Act constitutes a taking." 452 U. S., at 295.

That issue was *not* rejected as premature, but was decided on its merits, *id.*, at 295–297, just as it was in *Keystone*, and as it was before that in *Agins* v. *Tiburon*, 447 U. S. 255, 260–263 (1980).

In sum, it is entirely clear from our cases that a facial takings challenge is not premature even if it rests upon the ground that the ordinance deprives property owners of all economically viable use of their land—a ground that is, as we have said, easier to establish in an "as-applied" attack. It is, if possible, even more clear that the present facial challenge is not premature, because it does not rest upon a ground that would even profit from consideration in the context of particular application. As we said in *Agins*, a zoning law "effects a taking if the ordinance does not substantially advance legitimate state interests, . . . or denies an owner economically viable use of his land." *Id.*, at 260. The present challenge is of the former sort. Appellants contend that providing financial assistance to impecunious renters is not a state interest that can legitimately be furthered by regulating the use of property. Knowing the nature and character of the

particular property in question, or the degree of its economic impairment, will in no way assist this inquiry. Such factors are as irrelevent to the present claim as we have said they are to the claim that a law effects a taking by authorizing a permanent physical invasion of property. See *Loretto* v. *Teleprompter Manhattan CATV Corp.*, 458 U. S. 419 (1982). So even if we were explicitly to overrule cases such as *Agins*, *Virginia Surface Mining*, and *Keystone*, and to hold that a facial challenge will not lie where the issue can be more forcefully presented in an "as-applied" attack, there would still be no reason why the present challenge should not proceed.

Today's holding has no more basis in equity than it does in precedent. Since the San Jose Ordinance does not require any specification of how much reduction in rent is attributable to each of the various factors that the hearing officer is allowed to take into account, it is quite possible that none of the many landlords affected by the Ordinance will ever be able to meet the Court's requirement of a "showing in a particular case as to the consequences of [the hardship factor] in the ultimate determination of the rent." *Ante*, at 10. There is no reason thus to shield alleged constitutional injustice from judicial scrutiny. I would therefore consider appellants' takings claim on the merits.

## II

The Fifth Amendment of the United States Constitution, made applicable to the States through the Fourteenth Amendment, *Chicago, B. & Q. R. Co.* v. *Chicago*, 166 U. S. 226, 239 (1897), provides that "private property [shall not] be taken for public use, without just compensation." We have repeatedly observed that the purpose of this provision is "to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong* v. *United States*, 364 U. S. 40, 49 (1960); see also *First English Evangelical Lutheran Church of Glendale* v. *Los Angeles County*, 482 U. S.

304, 318–319 (1987); *Webb's Fabulous Pharmacies, Inc.* v. *Beckwith*, 449 U. S. 155, 163 (1980); *Agins* v. *Tiburon*, *supra*, at 260; *Penn Central Transportation Co.* v. *New York City*, 438 U. S. 104, 123 (1978); *Monongahela Navigation Co.* v. *United States*, 148 U. S. 312, 325 (1893).

Traditional land-use regulation (short of that which totally destroys the economic value of property) does not violate this principle because there is a cause-and-effect relationship between the property use restricted by the regulation and the social evil that the regulation seeks to remedy. Since the owner's use of the property is (or, but for the regulation, would be) the source of the social problem, it cannot be said that he has been singled out unfairly. Thus, the common zoning regulations requiring subdividers to observe lot-size and set-back restrictions, and to dedicate certain areas to public streets, are in accord with our constitutional traditions because the proposed property use would otherwise be the cause of excessive congestion. The same cause-and-effect relationship is popularly thought to justify emergency price regulation: When commodities have been priced at a level that produces exorbitant returns, the owners of those commodities can be viewed as responsible for the economic hardship that occurs. Whether or not that is an accurate perception of the way a free-market economy operates, it is at least true that the owners reap unique benefits from the situation that produces the economic hardship, and in that respect singling them out to relieve it may not be regarded as "unfair." That justification might apply to the rent regulation in the present case, apart from the single feature under attack here.

Appellants do not contest the validity of rent regulation in general. They acknowledge that the city may constitutionally set a "reasonable rent" according to the statutory minimum and the six other factors that must be considered by the hearing officer (cost of debt servicing, rental history of the unit, physical condition of the unit, changes in housing serv-

ices, other financial information provided by the landlord, and market value rents for similar units). San Jose Municipal Ordinance 19696, § 5703.28(c) (1979). Appellants' only claim is that a reduction of a rent increase below what would otherwise be a "reasonable rent" under this scheme may not, consistently with the Constitution, be based on consideration of the seventh factor—the hardship to the tenant as defined in § 5703.29. I think they are right.

Once the other six factors of the Ordinance have been applied to a landlord's property, so that he is receiving only a reasonable return, he can no longer be regarded as a "cause" of exorbitantly priced housing; nor is he any longer reaping distinctively high profits from the housing shortage. The seventh factor, the "hardship" provision, is invoked to meet a quite different social problem: the existence of some renters who are too poor to afford even reasonably priced housing. But *that* problem is no more caused or exploited by landlords than it is by the grocers who sell needy renters their food, or the department stores that sell them their clothes, or the employers who pay them their wages, or the citizens of San Jose holding the higher paying jobs from which they are excluded. And even if the neediness of renters could be regarded as a problem distinctively attributable to landlords in general, it is not remotely attributable to the *particular* landlords that the Ordinance singles out—namely, those who happen to have a "hardship" tenant at the present time, or who may happen to rent to a "hardship" tenant in the future, or whose current or future affluent tenants may happen to decline into the "hardship" category.

The traditional manner in which American government has met the problem of those who cannot pay reasonable prices for privately sold necessities—a problem caused by the society at large—has been the distribution to such persons of funds raised from the public at large through taxes, either in cash (welfare payments) or in goods (public housing, publicly subsidized housing, and food stamps). Unless we are to

abandon the guiding principle of the Takings Clause that "public burdens . . . should be borne by the public as a whole," *Armstrong*, 364 U. S., at 49, this is the only manner that our Constitution permits. The fact that government acts through the landlord-tenant relationship does not magically transform general public welfare, which must be supported by all the public, into mere "economic regulation," which can disproportionately burden particular individuals. Here the city is not "regulating" rents in the relevant sense of preventing rents that are excessive; rather, it is using the occasion of rent regulation (accomplished by the rest of the Ordinance) to establish a welfare program privately funded by those landlords who happen to have "hardship" tenants.

Of course all economic regulation effects wealth transfer. When excessive rents are forbidden, for example, landlords as a class become poorer and tenants as a class (or at least incumbent tenants as a class) become richer. Singling out landlords to be the transferors may be within our traditional constitutional notions of fairness, because they can plausibly be regarded as the source or the beneficiary of the high-rent problem. Once such a connection is no longer required, however, there is no end to the social transformations that can be accomplished by so-called "regulation," at great expense to the democratic process.

The politically attractive feature of regulation is not that it permits wealth transfers to be achieved that could not be achieved otherwise; but rather that it permits them to be achieved "off budget," with relative invisibility and thus relative immunity from normal democratic processes. San Jose might, for example, have accomplished something like the result here by simply raising the real estate tax upon rental properties and using the additional revenues thus acquired to pay part of the rents of "hardship" tenants. It seems to me doubtful, however, whether the citizens of San Jose would allow funds in the municipal treasury, from wherever derived, to be distributed to a family of four with income as

high as $32,400 a year—the generous maximum necessary to qualify automatically as a "hardship" tenant under the rental Ordinance.* The voters might well see other, more pressing, social priorities. And of course what $32,400-a-year renters can acquire through spurious "regulation," other groups can acquire as well. Once the door is opened it is not unreasonable to expect price regulations requiring private businesses to give special discounts to senior citizens (no matter how affluent), or to students, the handicapped, or war veterans. Subsidies for these groups may well be a good idea, but because of the operation of the Takings Clause our governmental system has required them to be applied, in general, through the process of taxing and spending, where both economic effects and competing priorities are more evident.

That fostering of an intelligent democratic process is one of the happy effects of the constitutional prescription—perhaps accidental, perhaps not. Its essence, however, is simply the unfairness of making one citizen pay, in some fashion other than taxes, to remedy a social problem that is none of his creation. As the Supreme Court of New Jersey said in finding unconstitutional a scheme displaying, among other defects, the same vice I find dispositive here:

> "A legislative category of economically needy senior citizens is sound, proper and sustainable as a rational classification. But compelled subsidization by landlords

---

*Under the San Jose Ordinance, "hardship" tenants include (though are not limited to) those whose "household income and monthly housing expense meets [sic] the criteria" for assistance under the existing housing provisions of § 8 of the Housing and Community Development Act of 1974, 42 U. S. C. § 1437f (1982 ed. and Supp. III). The United States Department of Housing and Urban Development currently limits assistance under these provisions for families of four in the San Jose area to those who earn $32,400 or less per year. Memorandum from U. S. Dept. of Housing and Urban Development, Assistant Secretary for Housing-Federal Housing Comm'r, Income Limits for Lower Income and Very Low-Income Families Under the Housing Act of 1937 (Jan. 15, 1988).

or by tenants who happen to live in an apartment building with senior citizens is an improper and unconstitutional method of solving the problem." *Property Owners Assn.* v. *North Bergen,* 74 N. J. 327, 339, 378 A. 2d 25, 31 (1977).

I would hold that the seventh factor in § 5703.28(c) of the San Jose Ordinance effects a taking of property without just compensation.