**OCALA KENNEL CLUB, INC., Plaintiff,**

v.

**Robert M. ROSENBERG, etc., et al., Defendants.**

**No. 86–151–Civ–Oc–16.**

United States District Court, M.D. Florida, Ocala Division.

Feb. 10, 1989.

Chester J. Trow, Ocala, Fla., for plaintiff.

W. Douglas Moody, Jr., Dept. of Business Regulation, Tallahassee, Fla., for defendants Rosenberg, Martinez.

Mack N. Cleveland, Jr., Sanford, Fla., for defendant Sanford.

## OPINION

JOHN H. MOORE, II, District Judge.

This Court held a bench trial of this cause on September 7, 1988, in Ocala, Flor-ida. Both sides were represented by counsel. The following memorandum opinion shall constitute the findings of fact and conclusions of law as required by FED.R. CIV.P. 52(a).

## INTRODUCTION

Ocala Kennel Club, Inc. (OKC), filed this lawsuit challenging the constitutionality of Florida Statute § 550.05(2) and seeking an injunction against its enforcement. The statute is part of Florida's comprehensive scheme regulating the parimutuel wagering industry. *See* Florida Statutes, Chapters 550 and 551. It provides that an application for a race meeting permit shall not be considered if the location is within 100 miles of another location for which a permit has been issued and a racing plant located. OKC desires to locate a greyhound racing facility within 100 miles of other existing tracks. However, because of Florida's 100–mile limitation rule, OKC's application for a permit will not even be considered.

Other Florida statutes regulating the location of parimutuel wagering establishments do not contain such a 100–mile distance limitation. For example, Florida Statute § 550.055(2) allows those who already hold valid permits for dog racing to relocate within a 30–mile radius of its existing location so long as the revenue-producing capacity of any other pari-mutuel wagering facility within 50 miles is not deteriorated. Florida Statute § 550.074 provides for permits to be made available to conduct summer jai alai games notwithstanding mileage and permit ratification requirements. In addition, Florida Statute § 550.075 allows harness racing permittees to convert to dog racing if the average daily "handle"[1] during the preceding 10 years has not exceeded 125,000 dollars, and the gross revenue to the state during the preceding 10 years does not exceed 350,000 dollars annually. Finally, Florida Statute § 551.12 imposes a 50–mile distance limita-

---

**1.** Handle is the total amount of pari-mutuel dollars expended by the public on a given pari- mutuel performance.

tion between a jai alai fronton and another location where pari-mutuel pools are conducted under Chapter 550.

OKC argues that these statutes conflict with the 100–mile limitation rule's underlying purpose of protecting state revenues. Thus, OKC claims that the statutory scheme creates a classification that distinguishes between those who already possess valid permits and those who do not. OKC maintains that such a classification violates the fourteenth amendment's equal protection clause because it is not rationally related to accomplishing Florida's legitimate goal of protecting the revenue-producing capacity of the pari-mutuel industry.

The defendants, Robert M. Rosenberg, Director of the Department of Business Regulation, Division of Pari–Mutuel Wagering of Florida, Sanford–Orlando Kennel Club, Inc.,[2] and the Governor of Florida, Bob Martinez, were represented at trial by the Florida Department of Business Regulation. The defendants contend that the 100–mile rule of § 550.05(2) is rationally related to protecting the revenue-raising capability of the pari-mutuel industry. First, they argue that the mileage limitation promotes economic viability of existing pari-mutuel operations by prohibiting the construction of new sites within 100 miles of any existing permittee. Secondly, defendants urge that the limitation serves to preserve the integrity of racing generally because it encompasses considerations of the availability of qualified animals, personnel, and competent state management. Third, the defendants argue that the statute has a rational relationship to preserving the efficacy of the tax structure encompassed in Florida Statutes §§ 550.09 and 551.06. Finally, defendants point out that Florida has the inherent power to regulate gambling facilities in the state for the purpose of serving societal welfare, and that the 100–mile rule is rationally related to this legitimate objective.

## FINDINGS OF FACT

1. OKC applied to the State of Florida, Department of Business Regulation, for a permit to operate a greyhound race track in Marion County, Florida. The proposed site consists of forty (40) acres of property located in the I–75 Industrial Park and is titled in the name of Robert Mantovani, President of OKC.

2. OKC submitted its application on or about June 24, 1986, to the Division of Pari–Mutuel Wagering of the State of Florida, Department of Business Regulation.

3. OKC does not currently conduct greyhound racing in Marion County, and holds no permit from the division.

4. The proposed OKC racetrack lies within 100 miles of the following greyhound racing facilities: Bayard Raceways, Inc., St. Johns County; Daytona Beach Kennel Club, Inc., Volusia County; Jacksonville Kennel Club, Inc., Duval County; Orange Park Kennel Club, Inc., Clay County; Sanford–Orlando Kennel Club, Inc., Pinellas County; Seminole Greyhound Park, Seminole County; Tampa Bay Downs, Hillsborough County; Solocan Corporation, Seminole County.

5. There is not currently, nor was there at the time the plaintiff's application was filed, any location in Marion County which is not within 100 miles of a location for which a pari-mutuel wagering permit has been issued and a racing plant located. There is not currently, nor was there at the time plaintiff's application was filed, any qualifying location in Florida.

6. Imposing distance limitations on pari-mutuel activities is a method that the legislature of Florida has employed in order to restrict the number of pari-mutuel licenses in the state. The 100–mile limitation of § 550.05(2) reflects a legislative attempt to limit the pari-mutuel licenses in the State, and in fact accomplishes this objective.

7. Florida's regulation of the pari-mutuel industry creates a classification that distinguishes between persons already pos-

---

**2.** Sanford–Orlando Kennel Club, Inc. did not participate in the trial of this case, but agreed to be bound by the result, its interests being identical with that of the other two defendants. *See* Supplement to Pretrial Stipulation, entered herein on September 1, 1988.

sessing permits and persons applying for new permits.

8. Florida has a direct economic interest in the revenue-producing capabilities of pari-mutuel permittees pursuant to Florida Statutes §§ 550.09 and 551.06, which provide for the state to collect daily license fees and taxes from permittees. The Division of Pari–Mutuel Wagering receives payment pursuant to those statutes which constitute revenue in the form of daily license fees, admissions tax, handle tax, breaks tax, and surtax on additional takeout.

9. The plaintiff introduced a report prepared for the Florida Legislature in 1986, by Price Waterhouse, entitled "A Report on the Effects of Competition in the Florida Pari–Mutuel Industry." Among other things, the report analyzed the potential impact of deregulation on the industry and the effect of distance restrictions. In Part II subsection D, pages 9–12, the effect of distance restrictions on competition is discussed. In the opening paragraph of subsection D, the report states that the "study found no definitive relationships between distance and the extent of competitive effects" because of a "limited number of competing Associations available for analysis in each mileage range" and "the apparent significance of marketplace characteristics not considered in this study." However, the report went on to state that the study "did reveal some tendencies which support the intuition that competitive effects increase as distance between competing facilities decrease." In addition, in considering the effects of deregulation on the industry, the report states at page 7 that "[t]he principal effect of distance restrictions has been to preclude new Associations from locating in strategically superior locations. Assuming that deregulation would allow new Associations to locate based on market potential, these new Associations could significantly reduce attendance and handle at other locations."

10. Mr. Lawrence A. Thibodeau gave expert testimony as the primary author of the aforementioned report. He testified that a dog-racing association could be placed at the location proposed by OKC without economic damage to other competing facilities within 100 miles of such proposed location.

11. The defendants called as a witness John P. Cochran, Management and Budget Administrator, Department of Business Regulation. Mr. Cochran participated in the preparation of the Price Waterhouse Report. He testified that the effect of the 100–mile limitation rule is to stabilize the market because it effectively excludes additional pari-mutuel tracks. This stability, he stated, makes revenue projections predictable. He also testified that removing the 100–mile limitation could upset the current structure of the market and quite possibly result in a decrease in handle with a concomitant decrease in revenue.

## CONCLUSIONS OF LAW

 Unless the statute under attack burdens a suspect class or impinges on a fundamental interest this Court must utilize the rational basis test in analyzing the statute. *Pennell v. City of San Jose*, 485 U.S. 1, 108 S.Ct. 849, 859, 99 L.Ed.2d 1 (1988); *Vance v. Bradley*, 440 U.S. 93, 97, 99 S.Ct. 939, 943, 59 L.Ed.2d 171 (1979). The Court finds, and the parties agree, that the economic regulation involved here does not implicate a fundamental interest or discriminate against a suspect class. Thus, the proper standard of review is whether the classification created by the statute bears a rational relationship to a legitimate governmental purpose. *Mixon v. One Newco, Inc.*, 863 F.2d 846 (11th Cir.1989).

 The rational basis standard is very deferential to legislative enactments. As the Court wrote in *Vance*, a court "will not overturn such a statute unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislature's actions were irrational." 440 U.S. at 97, 99 S.Ct. at 943. In other words, the rational basis test simply requires that a law have some relation to the accomplishment of a legitimate state interest. The analysis is a two-step process: (1) Is the state's interest legitimate? (2) Does the means by which

the state has chosen to achieve that interest rationally relate to the interest?

In this case, the Court finds, and the parties agree, that Florida has a legitimate interest in seeking to protect the revenue-producing capacity of the pari-mutuel industry. Thus, the only real question for this Court is whether the 100–mile limitation rule, which effectively excludes consideration of any application for a new permit, is rationally related to that objective. In considering this question the Court is not to sit as a superlegislature substituting its judgment for that of Florida's legislative branch, even if the enactment of the statute is considered improvident. *City of New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511 (1976).

The imposition of a 100–mile limitation rule serves to protect Florida's revenue base. It promotes the economic viability of existing pari-mutuel operations and in turn protects the efficacy of Florida's tax structure. Because § 550.05(2) rationally relates to the achievement of these state interests, the Court need not consider defendants' other arguments that the statute preserves the integrity of the industry generally, or that the state has an inherent interest in regulating gambling for the purpose of serving the social welfare.

As Mr. Cochran testified, the rule effectively excludes from the market additional pari-mutuel establishments. The ability of the state to effectively predict its incoming sources of revenue is one of its most significant concerns. Moreover, opening the market to new permit applicants could erode what is now a stable, predictable revenue base. Thus, although the Price–Waterhouse Report indicated that the pari-mutuel market in Florida may not be completely saturated, it also stated that the effects of deregulation of the industry were unpredictable.

Also, the Price Waterhouse Report stated that there was no definitive relationship found between distance and the extent of competitive effects. However, the Report was limited in scope by a small number of competing associations available for analysis and the significance of marketplace characteristics not considered in the study.

In addition, the Report points out that there is some support for the idea that competitive effects increase as distance between facilities decreases. Overall, this Report does not establish that a 100–mile limitation rule has no rational relationship to preserving state revenue.

In addition, the testimony of Mr. Thibodeau that OKC could build a dog-racing track at its desired location without adverse economic impact on the industry as a whole is not sufficient for this Court to find that the statute lacks a rational basis. Even if the Court assumes the correctness of Mr. Thibodeau's statement, it does not establish that the statute is not rationally related to the state's legitimate objective. The issue is not whether a particular geographic location for the establishment of a race track might be economically viable, but whether Florida's 100–mile limitation rule is related to protecting its revenue base as a whole.

In conclusion, the Court finds that the 100–mile limitation rule contained in Florida Statute § 550.05(2) is rationally related to the legitimate state interest of preserving the revenue-producing capabilities of the pari-mutuel industry and the efficacy of the state's tax structure. The evidence produced by defendants at trial established that the effective exclusion of new permits creates a stable market from which state revenues can be accurately predicted. The evidence demonstrated that removing such a distance-limitation rule could potentially upset the market and erode the revenue base. The evidence produced by the plaintiff did not militate against these facts. Accordingly, it is now

ORDERED AND ADJUDGED:

1. That the Court find for the Defendants and against the Plaintiff.

2. That the clerk of the court is hereby directed to enter a Final Judgment, pursuant to *Federal Rule of Civil Procedure* 58, in accordance with this opinion.

DONE AND ORDERED.