# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DANIEL GUGGENHEIM; SUSAN
GUGGENHEIM; MAUREEN H. PIERCE,
          *Plaintiffs-Appellants,*

          v.

CITY OF GOLETA, a municipal
corporation,
          *Defendant-Appellee.*

No. 06-56306

D.C. No.
CV-02-02478-FMC

OPINION

Appeal from the United States District Court
for the Central District of California
Florence-Marie Cooper, District Judge, Presiding

Argued and Submitted
June 22, 2010—Pasadena, California

Filed December 22, 2010

Before: Alex Kozinski, Chief Judge, Alfred T. Goodwin,
Stephen Reinhardt, Pamela Ann Rymer, Andrew J. Kleinfeld,
Ronald M. Gould, Richard R. Clifton, Consuelo M. Callahan,
Carlos T. Bea, Sandra S. Ikuta, and N. Randy Smith,
Circuit Judges.

Opinion by Judge Kleinfeld;
Dissent by Judge Bea

---

**COUNSEL**

Robert S. Coldren, Hart, King & Coldren, Santa Ana, California, for the appellants.

Andrew W. Schwartz (argued), Shute, Mihaly & Weinberger, LLP, San Francisco, California, and Amy E. Morgan (briefed), Burke, Williams & Sorensen, LLP, Los Angeles, California, for appellees.

David J. Bradford (briefed), Jenner & Block LLP, Chicago, Illinois, for amicus curiae Equity Lifestyle Properties.

Michael M. Berger (briefed), Manatt, Phelps & Phillips, LLP, Los Angeles, California, for amicus curiae Center for Constitutional Jurisprudence.

Gordon C. Atkinson (briefed), Cooley Godward Kronish LLP, San Francisco, California, for amicus curiae Golden State Manufactured-Home Owners League.

John J. McDermott (briefed), Arlington, Virginia, for amici curiae National Apartment Association, National Multi Housing Council, Apartment Association of California Southern Cities, Inc., and the Apartment Association of Orange County.

Grant Habata (briefed), California Association of Realtors, Los Angeles, California, for amicus curiae California Association of Realtors.

R. S. Radford (briefed), Pacific Legal Foundation, Sacramento, California, for amici curiae Pacific Legal Foundation and Manufactured Housing Institute.

Amy E. Margolin (briefed), Bien & Summers, Novato, California, for amicus curiae Western Manufactured Housing Communities Association.

Karen K. McCay, Sonia S. Shah, Anthony J. Adair, and Stepanie M. Vaughan, (briefed), Pahl & McCay, San Jose, California, for amicus curiae California Apartment Association.

Meaghan McLaine VerGow (briefed), O'Melveny & Myers LLP, Washington, D.C., for amici curiae Manufactured Housing Educational Trust, Goldstein Properties, Inc., and Morgan Partners, Inc.

Michael von Loewenfeldt (briefed), Kerr & Wagstaffe LLP, San Francisco, California, and Jeff M. Malawy (briefed), Aleshire & Wynder, LLP, Irvine, California, for amici curiae League of California Cities, and California State Association of Counties.

Terry R. Dowdall (briefed), Dowdall Law Offices, Orange, California, for amicus curiae California Mobilehome Parkowners Alliance.

Elizabeth B. Wydra (briefed), Constitutional Accountability Center, Washington, D.C., for amici curiae American Planning Association, APA California, Constitutional Accountability Center, and Western Center on Law and Poverty.

Meliah Schultzman (briefed), National Housing Law Project, Oakland, California, for amici curiae AARP, California Coalition for Rural Housing, Housing California, Legal Services of Northern California, Non-Profit Housing, Association of Northern California, R. Keith Traphagen, and Tenants Together.

**OPINION**

KLEINFELD, Circuit Judge:

We address the viability of a takings claim arising out of a rent control ordinance affecting mobile home parks.

## I. Facts

In 1979, Santa Barbara County, California adopted a rent control ordinance for mobile homes.[1] Mobile homes have the peculiar characteristic of separating ownership of homes that are, as a practical matter, affixed to the land, from the land itself.[2] Because the owner of the mobile home cannot readily move it to get a lower rent, the owner of the land has the owner of the mobile home over a barrel. The Santa Barbara County rent control ordinance for mobile homes had as its stated purpose relieving "exorbitant rents exploiting" a shortage of housing and the high cost of moving mobile homes.[3] The rent control

---

[1]Santa Barbara County, Cal., Ordinance 3, 122 (Oct. 22, 1979).

[2]*See Yee v. City of Escondido*:

The term "mobile home" is somewhat misleading. Mobile homes are largely immobile as a practical matter, because the cost of moving one is often a significant fraction of the value of the mobile home itself. They are generally placed permanently in parks; once in place, only about 1 in every 100 mobile homes is ever moved. A mobile home owner typically rents a plot of land, called a "pad," from the owner of a mobile home park. The park owner provides private roads within the park, common facilities such as washing machines or a swimming pool, and often utilities. The mobile home owner often invests in site-specific improvements such as a driveway, steps, walkways, porches, or landscaping. When the mobile home owner wishes to move, the mobile home is usually sold in place, and the purchaser continues to rent the pad on which the mobile home is located.

503 U.S. 519, 523 (1992) (citation omitted).

[3]The first section of the ordinance provides the "purpose" of enacting it:

ordinance was amended in 1987.[4] The ordinance has a complex scheme for setting rents, limiting how fast they rise, and affording landlords a mechanism for disputing the limits.[5]

---

> A growing shortage of housing units resulting in a critically low vacancy rate and rapidly rising and exorbitant rents exploiting this shortage constitutes serious housing problems affecting a substantial portion of those Santa Barbara County residents who reside in rental housing. These conditions endanger the public health and welfare of the County of Santa Barbara. Especially acute is the problem of low vacancy rates and rapidly rising and exorbitant rents in mobile home parks in the County of Santa Barbara. Because of such factors and the high cost of moving mobilehomes, the potential for damage resulting therefrom, requirements relating to the installation of mobilehomes, including permits, landscaping and site preparation, the lack of alternative homesites for mobilehome residents and the substantial investment of mobilehome owners in such homes, the Board of Supervisors finds and declares it necessary to protect the owners and occupiers of mobilehomes from unreasonable rents while at the same time recognizing the need for mobile home park owners to receive a fair return on their investment and rent increases sufficient to cover their increased costs. The purpose of this chapter is to alleviate the hardship caused by this problem by imposing rent controls in mobilehome parks within the unincorporated area of the County of Santa Barbara.

Goleta, Cal., Mun. Code § 08.14.010; *see also* Santa Barbara County, Cal., Ordinance 3,122 § 1 (Oct. 22, 1979), codified at Santa Barbara County, Cal., Code § 11A-1.

[4]Santa Clara County, Cal., Ordinance 3,678 (Dec. 21, 1987).

[5]The ordinance limits the ability of park owners to increase rent of existing tenants. Park owners may only do so once a year, or at the termination of a lease term. Goleta, Cal., Mun. Code §§ 08.14.070-080. The amount of the increase is determined through arbitration. Goleta, Cal., Mun. Code § 08.14.040. Park owners can automatically raise rent by 75% of the local consumer price index (a measure of inflation), and may seek additional increases for various reasons provided in the ordinance. *Id.* § 08.14.050. When a tenant sells the mobile home to a new tenant, the park owner may only increase the rent by 10%. *Id.* § 08.14.140.

Eighteen years after the original rent control ordinance went into effect, and ten years after the amendment, the plaintiffs Daniel and Susan Guggenheim and Maureen H. Pierce (the Guggenheims) bought a mobile home park, "Ranch Mobile Estates," burdened by the ordinance.

The park, when the Guggenheims bought it in 1997, was in what California calls "unincorporated territory" in Santa Barbara County. Five years later, in 2002, the City of Goleta incorporated in territory including the Guggenheims' land. California law requires a newly incorporated city comprising previously unincorporated territory to adopt, as its first official act, an ordinance keeping all the county ordinances in effect for 120 days or until the new municipality changes them, whichever happens first.[6] Goleta did what was required on its first day of existence, February 1, 2002, so the county rent control ordinance for mobile home parks became the city rent control ordinance on the first day of the City's existence, as the City's very first official act. And on April 22, 2002, within the 120-day sunset period, the City of Goleta adopted the county code including the ordinance, this time without the statutory 120-day sunset period.[7] The parties have stipulated that there was a legal gap when the ordinance was not in effect, apparently referring to the hours between the City's coming into legal existence and the performance of the City's first official act on its first day. Those hours on the first day of Goleta's existence are the only time between 1979 and the present day, and the only time during the Guggenheims' own-

---

[6]Cal. Gov't Code § 57376(a) ("If the newly incorporated city comprises territory formerly unincorporated, the city council shall, immediately following its organization and prior to performing any other official act, adopt an ordinance providing that all county ordinances previously applicable shall remain in full force and effect as city ordinances for a period of 120 days after incorporation, or until the city council has enacted ordinances superseding the county ordinances, whichever occurs first.").

[7]Goleta, Cal., Ordinance 02-17 (Apr. 22, 2002).

ership, when no rent control ordinance has burdened the Guggenheims' mobile home park.[8]

That year, 2002, the Guggenheims sued the City claiming that the rent control ordinance was a taking of their property without compensation, and asserting numerous other claims.[9] They have limited their takings claim to a facial challenge, not an "as applied" challenge. They claim that it is the rent control ordinance itself, not its particularized application to their mobile home park or the regulatory process applied to their park, that has denied them their constitutional rights. The theory of the takings claim is that by locking in a rent below market rents, and allowing tenants to sell their mobile homes to buyers who will still enjoy the benefits of the controlled rent (albeit subject to upward adjustment[10]), the ordinance shifts much of the value of ownership of the land from the landlord to the tenant. The Guggenheims submitted an expert's report with the summary judgment papers explaining that rents for sites in their mobile home park would average about $13,000 a year without rent control, but average less than $3,300 with rent control, and that the tenants could sell their mobile homes for around an average of $14,000 without rent control, but because of rent control, the average mobile

---

[8]We say there was a gap because the parties so stipulated, but we do not imply a construction of California law to that effect. The California statute says that the newly incorporated city must "immediately" and "prior to performing any other official act" adopt an ordinance maintaining the effectiveness of all county ordinances, so it may be that, were it not for the stipulation, there would be an arguable question whether there was any gap.

[9]These claims include a substantive due process claim, damages for the deprivation of constitutional rights, an equal protection claim, violations of the California state constitution, and a variety of other claims not at issue here. The federal constitutional claims are brought under 42 U.S.C. § 1983.

[10]Park owners can automatically raise rent by 75% of the local consumer price index (a measure of inflation), and may seek additional increases for various reasons provided in the ordinance. Goleta, Cal., Mun. Code § 08.14.050.

home in the park sells for roughly $120,000. Since the Guggenheims lost on summary judgment, we assume for purposes of decision that this is correct.

The case went through a complex procedural course, but the complexities are of no importance here. First the case in federal court was stayed pursuant to *Pullman*[11] abstention while the Guggenheims pursued claims in state court. They and the City settled the state case. Returning to federal court, the Guggenheims won summary judgment, and the City appealed. While the appeal was pending, the Supreme Court decided *Lingle v. Chevron U.S.A. Inc.*,[12] and the Guggenheims and the City agreed that *Lingle* so undermined the district court judgment that they stipulated to dismiss the appeal and they reopened the litigation in district court. This time the City won summary judgment, and the Guggenheims appeal. The district court observed that the Guggenheims "got exactly what they bargained for when they purchased the Park—a mobile-home park subject to a detailed rent-control ordinance." We reversed,[13] but decided to rehear the case en banc,[14] and now vacate our earlier decision and affirm.

## II.   Analysis

We review a grant of summary judgment de novo.[15] The Guggenheims' challenge is to the 2002 City of Goleta ordinance adopting the county rent control ordinance, and its readoption within the 120-day period.

---

[11]*See Railroad Comm. of Tex. v. Pullman Co.*, 312 U.S. 496, 501-02 (1941).

[12]544 U.S. 528 (2005).

[13]*Guggenheim v. City of Goleta*, 582 F.3d 996 (9th Cir. 2009).

[14]*Guggenheim v. City of Goleta*, 598 F.3d 1061 (9th Cir. 2010).

[15]*Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001).

## A.   Jurisdiction

**[1]** The City does not dispute jurisdiction, but we raised the issues of standing and ripeness sua sponte in our panel decision.[16] The Guggenheims have claimed an injury in fact to themselves (deprivation of much of the value of their land), which is fairly traceable to Goleta's rent control ordinance, and is redressable by a decision in their favor, so they do indeed have standing to maintain their challenge to the 2002 ordinances.[17] They owned the land in 2002 when the City of Goleta promulgated the 2002 ordinances.

Ripeness is more complicated, because of *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*.[18] In *Williamson*, the Supreme Court imposed two ripeness requirements on federal takings claims. First, a regulatory takings claim is not ripe until the appropriate administrative agency has made a final decision on how the regulation will be applied to the property at issue.[19] That requirement has no application to this facial challenge. "Facial challenges are exempt from the first prong of the *Williamson* ripeness analysis because a facial challenge by its nature does not involve a decision applying the statute or regulation."[20] Second, a property owner who sues for inverse condemnation,

---

[16]*Guggenheim*, 582 F.3d at 1004 n. 4.

[17]*See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *Colwell v. Dep't of Health & Human Servs.*, 558 F.3d 1112, 1121-22 (9th Cir. 2009) (quoting *Lujan*); *see also Equity Lifestyle Props., Inc. v. County of San Luis Obispo*, 548 F.3d 1184, 1193 (9th Cir. 2008) (holding that a property owner must own the affected property at the time the land use regulation is enacted to have standing to bring a facial regulatory takings claim); *Carson Harbor Village Ltd. v. City of Carson*, 37 F.3d 468, 472 (9th Cir. 1994), *overruled on other grounds by WMX Techs. Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (same).

[18]473 U.S. 172 (1985).

[19] *Id.* at 192-93; *see also Equity Lifestyle*, 548 F.3d at 1190.

[20]*Hacienda Valley Mobile Estates v. City of Morgan Hill*, 353 F.3d 651, 655 (9th Cir. 2003).

claiming that his property was taken without just compensation, generally must seek that compensation through the procedures provided by the state before bringing a federal suit.[21]

In *Yee v. City of Escondido*, another California mobile home rent control case, the Court held that although an "as applied" challenge would have been unripe because the park owner had not sought permission to increase rents from the administrative body established by the ordinance, the facial challenge by the park owners was indeed ripe, because it did not depend on the extent to which they were deprived of the economic use of their property or the extent to which they were compensated.[22] Subsequently in *Suitum v. Tahoe Regional Planning Agency*, the Court described the *Williamson* ripeness requirements as "prudential" rather than jurisdictional in the context of regulatory takings case.[23] In *Adam Brothers Farming, Inc. v. County of Santa Barbara*, we held that we had discretion to waive the *Williamson* exhaustion requirement where the case raised only prudential ripeness concerns, and did so, assuming without deciding that the takings claim was ripe.[24] In so doing, we applied *McClung v. City of Sumner*.[25] In *McClung* we had also interpreted *Suitum* as describing *Williamson* ripeness as prudential rather than jurisdictional, and concluded that "we need not determine the exact contours of when takings claim ripeness is merely prudential and not jurisdictional."[26]

That is not to suggest that *Williamson* is dead. In *Ventura Mobilehome Communities Owners Association v. City of San Buenaventura*, we held that the only cognizable claim raised

---

[21]*Williamson*, 473 U.S. at 195; *Equity Lifestyle*, 548 F.3d at 1190.

[22]503 U.S. 519, 533-34 (1992).

[23]520 U.S. 725, 733-34 (1997).

[24]604 F.3d 1142, 1147-48 (9th Cir. 2010).

[25]548 F.3d 1219 (9th Cir. 2008).

[26]*Id.* at 1224.

was an as applied challenge, so held that it was properly dismissed as unripe.[27] And in *Sinclair Oil Corp. v. County of Santa Barbara*, we held that while as applied challenges required *Williamson* exhaustion, facial challenges sometimes did and sometimes did not.[28] A complication that makes it especially difficult to determine the continuing viability of our ripeness precedents is that many involve "substantially advances legitimate state interests" claims under *Agins v. City of Tiburon*,[29] and *Agins* was overruled by *Lingle*.[30] Indeed, in the case before us, *Agins* was the law during state proceedings, and *Lingle* did not come down until the first appeal was pending in federal court. It may be that a claim (even a facial claim), alleging a regulatory taking based on the theory that an ordinance takes property without just compensation, is unripe until that property owner has sought compensation through such state proceedings as may be available. But under *Suitum* this ripeness requirement now appears to be prudential rather than jurisdictional.

**[2]** In this case, we assume without deciding that the claim is ripe, and exercise our discretion not to impose the prudential requirement of exhaustion in state court. Two factors persuade us to follow this course. First, we reject the Guggenheims' claim on the merits, so it would be a waste of the parties' and the courts' resources to bounce the case through more rounds of litigation. Second, the Guggenheims did indeed litigate in state court, and they and the City of Goleta settled in state court. Unfortunately the law changed after their trip to state court, so they might well have proceeded differently there had they been there after *Lingle* came down, but it is hard to see any value in forcing a second trip on them.

---

[27]371 F.3d 1046, 1052-54 (9th Cir. 2004).

[28]96 F.3d 401, 406-07 (9th Cir. 1996).

[29]447 U.S. 255, 260 (1980).

[30]*Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 545 (2005).

## B. *Penn Central* and *Palazzolo*

**[3]** The Guggenheims challenge only the 2002 City of Goleta ordinance, not the 1979 or 1987 County of Santa Barbara ordinances. The fundamental weakness of the dissent is its blending of the economic effects of all three ordinances, even though challenges to the first two have long been barred and are not asserted. There is a big problem with challenging as a taking the government's failure to repeal a long existing law. The County ordinances were both promulgated long before the Guggenheims bought their land, and the rent control regime created by the county ordinances limited the value of the land when the Guggenheims bought it. The Guggenheims assert no claim against the County of Santa Barbara, just the City of Goleta. They frame their challenge narrowly, solely as a facial challenge to the City of Goleta ordinance promulgated in 2002. And they argue that their facial challenge should be evaluated under *Penn Central Transportation Co. v. New York City*.[31] We assume, without deciding, that a facial challenge can be made under *Penn Central*.[32]

*Palazzolo v. Rhode Island*[33] is of no help to the Guggenheims. They do not have the problem that *Palazzolo* solved. In *Palazzolo* the taking was from the first owner and the "as applied" lawsuit was by the second. The transfer was by operation of law, during the period when the owner was ripening the claim by exhausting state remedies.[34] One reason why these distinctions matter is that even though in *Palazzolo* title passed to the plaintiff after the land use restriction was

---

[31]438 U.S. 104 (1977).

[32]*See Tahoe-Sierra Preserv. Council, Inc. v. Tahoe Reg. Planning Agency*, 535 U.S. 302, 334 (2002) ("[I]f petitioners had challenged the application of the moratoria to their individual parcels, instead of making a facial challenge, some of them might have prevailed under a *Penn Central* analysis.").

[33]533 U.S. 604, 627-28 (2001).

[34]*Id.* at 614.

enacted, he acquired his economic interest as a 100% shareholder in the corporation owning the land before the land use restriction was enacted, and title shifted to him because his corporation was dissolved, not because he bought the property for a low price reflecting the economic effect of the regulation.

**[4]** *Palazzolo* holds that an owner who acquires title to property during the period required for an as applied regulatory taking to ripen (in that case during proceedings on applications to build on wetlands) is not necessarily barred from bringing the action when it ripens even though he did not own the property when the regulation first started to be applied to the property.[35] This difference matters because an as applied challenge necessarily addresses the period during which the administrative or judicial proceedings for relief occur, so justice may require that title transfers during the ripening period not bar the action. By contrast, there is no such extended period applicable to a facial challenge, because the only time that matters is the time the ordinance was adopted.

**[5]** The Guggenheims, unlike the owner in *Palazzolo*, have owned the mobile home park at all relevant times. The Guggenheims owned during, before, and after adoption of the two City of Goleta ordinances they challenge, both upon incorporation and within the 120-day period. *Palazzolo* does not revive a challenge to the 1979 and 1987 county ordinances,[36] and the Guggenheims do not make one. Thus whatever

---

[35]*Id.* at 628 ("A challenge to a land use regulation, by contrast, does not mature until ripeness requirements have been satisfied, under principles we have discussed; until this point an inverse condemnation claim alleging a regulatory taking cannot be maintained. It would be illogical, and unfair, to bar a regulatory takings claim because of the post-enactment transfer of ownership where the steps necessary to make the claim ripe were not taken, or could not have been taken, by a previous owner.").

[36]*Daniel v. County of Santa Barbara*, 288 F.3d 375, 384 (9th Cir. 2002). We have also rejected the argument that *Palazzolo* "eliminat[es] any statute of limitations requirement." *Equity Lifestyle*, 548 F.3d at 1193 n.15.

wrongs the 1979 and 1987 county ordinances may have done to whoever owned the mobile home park then, those wrongs are not before us.

And the Guggenheims carefully limit their challenge to a facial one, not an as applied challenge. By so doing, they reserve the possibility of an as applied challenge if at some subsequent time the City of Goleta's arbitrator denies them a fair rent increase.[37] If the rent control scheme effects an unconstitutional taking when applied, the challenge will be to that application, not to the ordinance on its face, and the time for the challenge will run from when the administrative action became final as opposed to when the ordinance was enacted. It is not as though an unconstitutional law becomes immunized from all challenges once limitations bar facial challenges to its enactment.

As we held in *Levald, Inc. v. City of Palm Desert*, "[i]n the takings context, the basis of a facial challenge is that the very enactment of the statute has reduced the value of the property or has effected a transfer of a property interest. This is a single harm, measurable and compensable when the statute is passed."[38] Nor does it matter that a challenge might not have been worth making in 1979 or 1987 when property values were lower, but became worth making when the housing bubble inflated many prices. As *Levald* stated, "while the rising property values may be relevant to an as-applied challenge, they are not relevant to a claim that the very enactment of the statute effected a taking."[39]

---

[37]We do not address whether the limitation on the amount by which rents can increase and the provisions for arbitration of rent increases may work a taking, because that cannot be determined until these limitations are applied. That we reject the facial challenge has no bearing one way or the other on whether an as applied challenge might succeed.

[38]998 F.2d 680, 688 (9th Cir. 1993).

[39]*Id.*

**[6]** But this is not to say that passage of the county ordinances in 1979 and 1987 can be ignored. It is central. *Yee v. City of Escondido*[40] holds that a takings challenge to mobile home rent control ordinance materially similar to Goleta's should be analyzed as a regulatory taking under *Penn Central*, not a physical occupation amounting to a per se taking as in *Loretto v. Teleprompter Manhattan CATV Corp.*[41] *Lingle* explains *Penn Central* as identifying several factors, not a set formula, to determine whether a regulatory action is "functionally equivalent to the classic taking."[42] "Primary among those factors are the economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations."[43] *Lingle* points out that the character of the government action may also be relevant,[44] but this cuts against the Guggenheims because the government action here is a continuation of an old ordinance. The case before us turns on the "primary" factor.

**[7]** That "primary factor," "the extent to which the regulation has interfered with distinct investment-backed expectations," is fatal to the Guggenheims' claim. We assume for purposes of discussion (since the Guggenheims' summary judgment evidence would so establish) that the rent control ordinance, unchanged since 1987, did indeed transfer about $10,000 a year in rent for the average mobile home owner from the landlord to the tenant, and that this has had the effect of raising the price of the average mobile home from $14,000 to $120,000. That had happened before the Guggenheims bought the mobile home park. Since the ordinance was a matter of public record, the price they paid for the mobile home park doubtless reflected the burden of rent control they would have to suffer.

---

[40]503 U.S. 519, 532 (1992).

[41]458 U.S. 419 (1982).

[42]*Lingle*, 544 U.S. at 539.

[43]*Id.* at 538-39 (internal editorial and quotation marks omitted).

[44]*Id.* at 539.

**[8]** They could have no "distinct investment-backed expectations" that they would obtain illegal amounts of rent. To "expect" can mean to anticipate or look forward to, but it can also mean "to consider probable or certain," and "distinct" means capable of being easily perceived, or characterized by individualizing qualities.[45] "Distinct investment-backed expectations" implies reasonable probability, like expecting rent to be paid, not starry eyed hope of winning the jackpot if the law changes. A landlord buys land burdened by leaseholds in order to acquire a stream of income from rents and the possibility of increased rents or resale value in the future. The stream already suffered a reduced flow when the Guggenheims bought it, so what they paid would reflect the flow that the law allowed. The Guggenheims might conceivably have paid a slight speculative premium over the value that the legal stream of rent income would yield, on the theory that rent control might someday end, either because of a change of mind by the municipality or court action. But that premium could be no more than a speculative possibility, not an "expectation." Speculative possibilities of windfalls do not amount to "distinct investment-backed expectations," unless they are shown to be probable enough materially to affect the price.[46] The idea, after all, of the constitutional protection we

[45]*Webster's Third New International Dictionary* 658, 799 (1981).

[46]The dissent suggests that any speculative possibility, including the speculative possibility that a long existing law might change, should be enough to give rise to a takings claim if that speculative possibility is cut off. Thus, under the dissent's approach, if a statute prohibiting some land use were converted into a state constitutional amendment, the identical language in the constitutional amendment would amount to a taking, because it reduced the speculative possibility that the law might be repealed.

It is one thing to speculate that the value of your land might change based on market demand; it is another to gamble that a stable law may be repealed or nullified. While there is always some possibility that the law may change, and the dissent suggests that possibility may be especially great in California, that possibility ought generally to be deemed too slight to give rise to a takings claim when the law is reenacted rather than repealed.

enjoy in the security of our property against confiscation is to protect the property we have, not the property we dream of getting. The Guggenheims bought a trailer park burdened by rent control, and had no concrete reason to believe they would get something much more valuable, because of hoped-for legal changes, than what they had.

The Guggenheims and the City of Goleta stipulated that there was a period of time when their mobile home park was free of rent control. That was the period of hours after "organization" of the City of Goleta and, "prior to performing any other official act."[47] This period could not have given rise to a reasonable investment-backed expectation, because the Guggenheims had already made their investment years before, and even if they had bought the mobile home park during those few hours, they would have known that Goleta's first official act would, under controlling law, have to be adoption of the county's rent control ordinance.

The Guggenheims also argue that the 120-day period when the rent control ordinance would be terminated unless readopted gave them a reasonable expectation that it would not be readopted. This argument too fails to account for the fact that their investment had already been made, years before. And even if it had been made during the 120 days, it is not as though the ordinance was in limbo during that period. The rent control ordinance was the law. Though the city might choose to let the ordinance lapse instead of readopting it, that possibility was as speculative as the possibility that the city might end rent control after the 120-day period. This speculation is less than an expectation.

*Lingle* holds that *Penn Central*, though not establishing a set formula, identifies significant factors, "the economic effect on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed

---

[47]*See* Cal. Gov't Code § 57376(a).

expectations. In addition, the character of the governmental action—for instance whether it amounts to a physical invasion or instead merely affects property interests through some public program adjusting the benefits and burdens of economic life to promote the common good—may be relevant in discerning whether a taking has occurred."[48] The character of the government action does not help the Guggenheims. The City of Goleta did not adjust the benefits and burdens of economic life, it left them as they had been for many years.

Whatever unfairness to the mobile home park owner might have been imposed by rent control, it was imposed long ago, on someone earlier in the Guggenheims' chain of title. The Guggenheims doubtless paid a lot less for the stream of income mostly blocked by the rent control law than they would have for an unblocked stream. The 2002 City of Goleta adoption by reference of the Santa Barbara County ordinance did not transfer wealth from them to their tenants. That transfer occurred in 1979 and 1987, from other landlords, and probably benefitting other tenants.

[9] The people who really do have investment-backed expectations that might be upset by changes in the rent control system are tenants who bought their mobile homes after rent control went into effect. Ending rent control would be a windfall to the Guggenheims, and a disaster for tenants who bought their mobile homes after rent control was imposed in the 70's and 80's. Tenants come and go, and even though rent control transfers wealth to "the tenants," after a while, it is likely to affect different tenants from those who benefitted from the transfer. The present tenants lost nothing on account of the City's reinstitution of the County ordinance. But they would lose, on average, over $100,000 each if the rent control ordinance were repealed. The tenants who purchased during the rent control regime have invested an average of over

---

[48]*Lingle*, 544 U.S. at 538-39 (internal editorial and quotation marks omitted).

$100,000 each in reliance on the stability of government poli-cy.[49] Leaving the ordinance in place impairs no investment-backed expectations of the Guggenheims, but nullifying it would destroy the value these tenants thought they were buy-ing.

## C.　Equal Protection and Due Process Claims

The Guggenheims make two other arguments, that the ordi-nance denies them substantive due process because it does not assure them a fair return on their investment, and that it denies them equal protection of the law because it treats mobile home park owners differently from other landlords.

[10] Due process claims can succeed when a rent control ordinance fails to substantially further a legitimate govern-ment interest.[50] The dissent argues that this ordinance did not achieve its purpose because it fails to control the price of sub-lets. It is true that the rent control ordinance at issue here does not control the rental price of a mobile home for occupants such as subletters. It controls the rental price of the land on which the mobile home is situated. This is in keeping with the purpose of the ordinance, which is not just to lower rents, but to "alleviate the hardship" to mobile home owners caused by "the high cost of moving mobilehomes, the potential for dam-age resulting therefrom, requirements relating to the installa-tion of mobilehomes, including permits, landscaping and site preparation, the lack of alternative homesites for mobilehome

---

[49]We do not imply that a change in government policy amounts to a tak-ing from the beneficiaries. *See Madera Irrigation Dist. v. Hancock*, 985 F.2d 1397, 1403 (9th Cir. 1993) (holding that "[r]easonable expectations arising out of past policy but without a basis in cognizable property rights may be honored by prudent politicians, because to do otherwise might be unfair, or because volatility in government policy will reduce its effective-ness in inducing long term changes in behavior. But violation of such expectations cannot give rise to a Fifth Amendment claim.").

[50]*Richardson v. City and County of Honolulu*, 124 F.3d 1150, 1165 (9th Cir. 1997).

residents and the substantial investment of mobilehome owners in such homes."[51] The ordinance protects mobile home owners, not all renters. Such a purpose does not protect mobile home renters from all market increases in the value of occupancy. It protects owners of mobile homes from the leverage owners of the pads have, to collect a premium reflecting the cost of moving the mobile home on top of the market value of use of the land. This is a legitimate government purpose, related to but distinct from lowering housing prices for all renters.

[11] Whether the City of Goleta's economic theory for rent control is sound or not, and whether rent control will serve the purposes stated in the ordinance of protecting tenants from housing shortages and abusively high rents or will undermine those purposes, is not for us to decide. We are a court, not a tenure committee, and are bound by precedent establishing that such laws do have a rational basis.[52] Students in Economics 101 have for many decades learned that rent control causes the higher rents and scarcity it is meant to alleviate,[53] but the Due Process Clause does not empower courts to impose sound economic principles on political bodies.[54]

---

[51]Goleta, Cal., Mun. Code § 08.14.010.

[52]*See Pennell v. City of San Jose*, 485 U.S. 1, 13 (1988) ("we have long recognized that a legitimate and rational goal of price or rate regulation is the protection of consumer welfare"); *Equity Lifestyle Props., Inc. v. County of San Luis Obispo*, 548 F.3d 1184, 1194 (9th Cir. 2008) ("The Supreme Court and this Circuit have upheld rent control laws as rationally related to a *legitimate public purpose*."); *Carson Harbor Village Ltd. v. City of Carson*, 37 F.3d 468, 472 (9th Cir. 1994), *overruled on other grounds by WMX Techs. Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) ("A generally applicable rent-control ordinance will survive a substantive due process challenge if it is 'designed to accomplish an objective within the government's police power, and if a rational relationship existed between the provisions and the purpose of the ordinances.' ").

[53]*See, e.g.*, William J. Baumol & Alan S. Blinder, ECONOMICS: PRINCIPLES AND POLICY 64-67 (2d ed. 1982).

[54]*See Lochner v. New York*, 198 U.S. 45, 75 (1905) (Holmes, J., dissenting) ("The Fourteenth Amendment does not enact Mr. Herbert Spencer's Social Statics.").

**[12]** The Guggenheims' equal protection theory is also foreclosed by precedent,[55] and would have no force even if it were not, because only a rational basis is needed for this ordinance, and mobile parks differ from most other property in the separation of ownership of the land from the improvements affixed to the land. It is possible that application of the ordinance by the arbitrator will violate substantive or procedural due process requirements, but that remains to be seen, if at all, in an as applied challenge to its application.

**AFFIRMED.**

---

BEA, Circuit Judge, dissenting, joined by KOZINSKI, Chief Judge, and IKUTA, Circuit Judge:

I must respectfully dissent for two reasons.

First, because the majority misapplies the Supreme Court's analysis of regulatory takings claims. It ignores two essential elements of that analysis, and fails to follow the Court's instructions on the one element it uses to disqualify the claim. The majority impermissibly picks out only one of the three factors the Court has told us to consider in determining whether a regulation effects a taking under the *Penn Central* test—whether the claimant had "distinct investment-backed expectations"—and inexplicably disdains the other two. This converts a three-factor balancing test into a "one-strike-you're-out" checklist. Not content to rewrite one binding precedent, the majority ignores the Court's recent holding in *Palazzolo* that an investor can validly expect that a land control measure, in place when he invests, is not necessarily eternal and therefore does not disqualify his claim of regulatory taking. *Palazzolo v. Rhode Island*, 533 U.S. 606, 627 (2001).

---

[55]*Equity Lifestyle*, 548 F.3d at 1195 (9th Cir. 2008) ("This equal protection challenge must be considered under rational basis review because mobilehome park owners are not a suspect class.").

Second, because it decides the substantive due process and equal protection claims by citing rent control cases. But, the Goleta ordinance is not a rent control law for the simple reason that it is not designed to—nor does it—control rents. It does not just miss the mark because of unintended consequences or inefficient administration. Its very structure was designed and intended not to provide housing rent control, but to transfer wealth from mobile home park owners to one group of lucky tenants. The measure we deal with here is a wealth transfer, pure and simple, with none of the features of rent control thought legitimate governmental interests. As such, its enforcement violates due process and equal protection.

## I.   Background

Appellants Daniel Guggenheim, Susan Guggenheim, and Maureen H. Pierce (collectively, the "Guggenheims"), appeal the district court's grant of summary judgment in favor of the City of Goleta. The Guggenheims own the land on which mobile homes sit. In 2002, the City of Goleta adopted a mobile home rent control ordinance. The Ordinance capped the rate of annual rent the Guggenheims could charge for the mobile home lots, and provided for a maximum of 10% rent increases upon the sale of the mobile home to a new tenant. Importantly, the Ordinance provided no cap on the amount mobile home owners could charge when leasing or selling the actual mobile home.

The Guggenheims brought suit alleging the Ordinance constituted a regulatory taking, thus entitling them to just compensation under the Fifth and Fourteenth Amendments. The Guggenheims also alleged due process and equal protection claims. Although the Guggenheims presented evidence that the Ordinance effects a wealth transfer from the mobile home land owners to the lucky, "windfall tenants" who held tenancies at the time of the enactment of the Ordinance, and that the Ordinance is not written in such a way as to effect a legiti-

mate state interest—such as providing affordable housing to low income people—the district court granted summary judgment against them.[1]

## II.   Takings Clause

Claiming to apply the three-factor test from *Penn Central*, the en banc majority opinion holds as a matter of law that the Guggenheims cannot establish the mobile home rent control ordinance effects a regulatory taking of its property for public use within the meaning of the Fifth Amendment, as applied to Goleta through the Fourteenth Amendment. The majority's principal error is its finding, as a matter of law, that the Ordinance could not interfere with the Guggenheims' "distinct investment-backed expectations" of freeing their land from "rent control." Maj. Op. at 20434. The majority reaches this conclusion only by adopting a view of the law and of the economic effects of the Goleta ordinance that is static and provides no opportunity for change or innovation. While attractive for its simplicity, such stasis does not reflect the world in which we live, nor the teachings of the Court.

In *Penn Central Transportation Company v. New York City*, 438 U.S. 104 (1978), the Court set forth the three factors that must be considered in determining whether a regulation effects a taking: (1) the economic impact of the regulation on the claimant; (2) the character of the government's action; and (3) the extent to which the regulation interferes with the claimant's investment-backed expectations. *Id.* at 124. The majority opinion deals only with the last factor, as if *Penn Central* established a "one-strike-you're-out" checklist for

[1]We review the district court's order granting summary judgment in favor of the City *de novo*. *Lovell v. Chandler*, 303 F.3d 1039, 1052 (9th Cir. 2002). We "must determine, viewing the evidence in the light most favorable to the non-moving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant law." *Ventura Packers*, *Inc. v. F/V Jeanine Kathleen*, 305 F.3d 913, 916 (9th Cir. 2002).

knocking property owners out of court, rather than a three-factor balancing test in which each factor *must* be considered. No one factor is "talismanic," Justice O'Connor said in *Palazzolo* when she criticized the state supreme court for "elevating what it believed to be '[petitioner's] lack of reasonable investment-backed expectations' to 'dispositive status.' " *Palazzolo*, 533 U.S. at 634 (O'Connor, J., concurring). The extent of interference with investment-backed expectations instead "is *one* factor that points toward the answer to the question whether the application of a particular regulation to particular property 'goes too far.' " *Id.* (quoting *Penn. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922)). Since *Penn Central* requires all factors be considered, that is what I shall do. Each of these factors militates in favor of finding that Goleta's so-called rent control ordinance (the "Ordinance") effected a regulatory taking.

## A. The Economic Impact of the Ordinance

> Primary among [the *Penn Central*] factors are the economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations.

*Lingle v. Chevron*, 544 U.S. 528, 538-39 (2005) (internal quotation marks omitted).[2]

---

[2]In *Lingle*, an oil company brought suit under the Fifth and Fourteenth Amendments challenging a Hawaii statute which limited the rent oil companies could charge dealers to lease company-owned service stations. Applying *Agins v. City of Tiburon*, 447 U.S. 255 (1980)—in which the Supreme Court declared that government regulation of private property "effects a taking if [it] does not substantially advance legitimate state interests—the District Court held that the rent cap effected a taking. The Ninth Circuit affirmed. The Supreme Court reversed and remanded, holding that *Agins*' "substantially advances" test is not a valid takings test. *Lingle*, 544 U.S. at 548.

The majority opinion settles on the factor of "distinct investment-backed expectations," but fails to provide any analysis of the general economic impact of the Goleta Ordinance on the claimant.[3] Let's provide that analysis.

The Guggenheims presented evidence that the Ordinance deprives them of approximately 80% of the market value of their mobile home park land—nearly all of which value is effectively transferred to the original tenants by enactment of the Ordinance. The Ordinance limits the amount by which rents on the mobile home pads may be increased to 75% of the Consumer Price Index, plus an additional amount to pass through increased operating costs, capital expenses, and capital improvements. Ordinance §§ 11A-5, 11A-6. The Ordinance also contains a vacancy control provision, which limits to 10% the permissible rent increase on the mobile home pad when a mobile home unit changes ownership. *Id.* § 11A-14. The parties and the district court did not dispute that the Ordinance seriously impacted the value of the Guggenheims' property:

> During the time that [the Guggenheims] have owned the Park, housing costs in the City have increased approximately 225%. Because of the rent-control ordinance, the rents charged by [the park owners] have not kept pace with this increase . . . existence

---

[3]I am puzzled, but grateful, to learn what the majority thinks is the fundamental weakness of this dissent: "[the] blending of the economic effects on the Guggenheims of all three ordinances." Maj. Op. at 20431.

Puzzled, because there are no economic effects on the Guggenheims from the two previously-enacted ordinances: the Santa Barbara 1979 and 1987 ordinances. Since Goleta incorporated itself into a city in 2002, only the 2002 Goleta ordinance imposes price control on the land the Guggenheims rent out. Indeed, the majority acknowledges it is only the 2002 ordinance which the Guggenheims challenge. Maj. Op. at 20431.

Grateful, to learn that I need not worry about the economic effects of the Santa Barbara ordinance; neither do the Guggenheims.

of lower-than-market value rents has resulted in the ability of mobilehome owners to sell their homes at a significant premium [the "transfer premium"]. According to the analysis of [the Guggenheims'] expert, based on the sale of 64 mobile homes from January 15, 1999 through July 21, 2004, the premium amounted to, on average, 88% of the sale price. In other words, an average mobile home worth $12,000 would sell for approximately $100,000.

As outlined in the report by the Guggenheims' expert, Dr. Quigley[4], and accepted by the district court, the Ordinance required the Guggenheims to rent all Park mobile home pad spaces at approximately 20% of their market value.[5] The market price of a mobile home increases when the rent the homeowner pays for space in a mobile home park decreases. Dr. Quigley estimated that, on average, almost 90% of a mobile home's sale price represented the value of the lower rents set by the Ordinance, and this premium went into the pockets of the tenants incumbent at the time of the Ordinance's enactment, hereafter the "windfall tenants."

There is no authority for the proposition relied on by the district court that a taking has not occurred when the complaining party continues to receive some return on investment. *See Cienega Gardens v. United States*, 331 F.3d 1319, 1343 (Fed. Cir. 2003) (finding that an exaction of 96% of the property's return on equity was severe enough to constitute a taking under *Penn Central*). The *Penn Central* test looks at the severity of the economic burden, and a finder of fact could

[4]Dr. Quigley is a professor of economics, business, and policy at the University of California, Berkeley. *See* Carl Mason & John M. Quigley, *The Curious Institution of Mobile Home Rent Control*, 16 J. Housing Econ. 189, 189 (2007).

[5]Of course, as the years go by, and if housing costs increase, this 80% disparity between market and regulated rents will increase and the magnitude of the Ordinance's economic impact will grow.

easily determine that a loss of 80% of the market value of property is just such a severe economic burden, even though the property owner receives *some* return on investment. In *Penn Central*, the Court held that enforcement of a landmark preservation ordinance to bar construction of a fifty-story office building was not a regulatory taking because the restricted airspace rights could be transferred to other parcels owned by the litigant; the option of constructing an office building at those other locations reduced the economic impact of the regulation. *Penn Central*, 438 U.S. at 137. But the Guggenheims are not so positioned: (1) they have no other lots, and (2) if they had, there is no benefit under the Ordinance which they could transfer to such lots. Moreover, the *Penn Central* landmark ordinance was generally-applicable to all types of property owners and barred only expansions of existing uses.

Further, California imposes considerable obstacles to alternate uses of the mobile home park. To convert the park to any other use, the Guggenheims must obtain approval of their plan from the city council. Cal. Gov. Code § 66427.5(e). As part of the approval process, they must file a plan outlining the new use to which the property will be put and detailing the impact of the conversion on existing residents, and also conduct a "survey of support of residents . . . . pursuant to a written ballot," the results of which must be submitted along with the application and may be taken into account by the city council when it votes on the conversion plan. *Id.* § 66427.5(b), (d); *see Colony Cove Props., LLC v. City of Carson*, 114 Cal. Rptr. 3d 822, 835 (Cal. Ct. App. 2010). Additionally, because the cost of the Ordinance is borne solely by mobile home park owners—and not lessors of other housing—its economic impact on those park owners is more severe than a broad-based housing regulation. This factor favors finding a "taking" has occurred.

### B. Investment-Backed Expectations of All the Park Owners

The majority opinion holds that the determinative *Penn Central* factor must be the extent to which the regulation has interfered with the claimant's distinct investment-backed expectations; and that factor "is fatal to the Guggenheims' claim." Maj. Op. at 20434. In addition to avoiding the question of how a single factor in a three-factor test could be "fatal" without consideration or balancing of the other factors,[6] this holding is incorrect for three reasons.

First, the majority opinion holds, as a matter of law, that the Guggenheims cannot have investment-backed expectations of freeing their land from the rent control ordinance because they knew the regulation was in effect when they purchased the mobile home park. This could be a logical conclusion to reach—but only were one to ignore (1) the instructions of the Supreme Court, (2) decades of political, legal, and economic developments, and (3) the actions of the Guggenheims.

First, the Supreme Court has specifically held that the fact claimants knew of a land-use regulation at the time they took title to their land does *not* bar them from challenging that regulation, nor from contending that the ordinance lessened the value of their land by interference with their investment-backed expectations.

> Were we to accept the State's rule [that appellants had no investment-backed expectations because the ordinance was enacted before they purchased the land], the postenactment transfer of title would absolve the State of its obligation to defend any action restricting land use, no matter how extreme or unreasonable. *A State would be allowed, in effect, to*

---

[6]Justice O'Connor made this precise point in her concurrence in *Palazzolo*, *supra* at p. 20443.

> *put an expiration date on the Takings Clause*. This
> ought not to be the rule. Future generations, too,
> have a right to challenge unreasonable limitations on
> the use and value of land.

*Palazzolo*, 533 U.S. at 627 (emphasis added). In his concurrence, Justice Scalia was even more explicit in criticizing the methodology employed by the majority here:

> In my view, the fact that a restriction existed at the
> time the purchaser took title . . . should have no bearing upon the determination of whether the restriction
> is so substantial as to constitute a taking. The
> 'investment-backed expectations' that the law will
> take into account *do not include the assumed validity
> of a restriction* that in fact deprives property of so
> much of its value as to be unconstitutional.

*Id.* at 637 (Scalia, J., concurring) (emphasis added) (internal citation omitted). The majority's dismissal of the Guggenheim's investment-backed expectations, on the basis that they knew what they were getting into, directly contravenes Supreme Court precedent and assumes the eternal validity, without reform, of the so-called rent control ordinance.[7] It

---

[7]Not only does *Palazzolo* recognize the Guggenheims' ability to bring a takings claim on the basis of their own reasonable investment-backed expectations, but it also acknowledges the ability of a land owner to bring a regulatory takings action for a loss in value that was suffered by a previous land owner. As *Palazzolo* points out, the government is not absolved of its obligation to defend actions restricting land use, merely on account of a postenactment transfer of title. 533 U.S. at 627. A rule barring land owners from challenging ordinances that were enacted during a previous landowner's tenure, the Court explained, "would work a critical alteration to the nature of property, as the newly regulated landowner is stripped of the ability to transfer the interest which was possessed prior to the regulation. The State may not by this means secure a windfall for itself." *Id.* Consequently, the panel majority's observation that any unfairness attributable to the rent control ordinance "was imposed long ago[ ] on someone

does not come as a surprise the majority's stance on this sub-
ject comes without legal authority.

The majority opinion asserts that *Palazzolo* "is of no help
to the Guggenheims," Maj. Op. at 20431, but one is puzzled
by its attempts to distinguish *Palazzolo*. The majority notes
that the claimant in *Palazzolo* challenged the land-use regula-
tion as it was applied to him, whereas here, the Guggenheims
bring a facial challenge to the Ordinance. *Id.* at 20431. So?
*Penn Central* involved an as-applied challenge; but it gave us
rules of general application as to what constitutes a regulatory
taking.[8] Next, the majority points out the transfer in *Palazzolo*
was by operation of law (the claimant, as controlling share-
holder of the corporation which owned the land, acquired the
property when the corporation dissolved), whereas the Gug-
genheims purchased the mobile home park on the open mar-
ket. So? The plaintiff in *Palazzolo* acquired title after the
challenged land-use restriction was enacted and nonetheless
prevailed without claiming that he should be considered to
have become the owner when his corporation bought the land
before the restriction's enactment, on some theory of advanta-
geous piercing of the corporate veil *cum* relation back. These
"distinctions" are mere differences, no more significant than

---

earlier in the Guggenheims' chain of title," is unavailing. Maj. Op. at
20437. *Palazzolo* makes clear that to the extent a previous landowner had
the right to bring a regulatory takings challenge against an ordinance
enacted during its tenure, successive landowners enjoy the same right. 533
U.S. at 627. Thus, even though the ordinance at issue effected a wealth
transfer from the previous land owner to tenants in 1979 and 1987, which
wealth transfer is kept in place by the 2002 Goleta ordinance, the Guggen-
heims may challenge the ordinance and seek recovery on the basis of the
previous land owner's loss. *Id.* That loss is passed on to the Guggenheims
as an incident of property ownership. In accounting terms, it is a transfer-
able contingent asset.

[8] *See Lingle*, 544 U.S. at 539 (calling the *Penn Central* factors the "prin-
cipal guidelines for resolving regulatory takings claims"); *see also Chev-
ron USA, Inc. v. Cayetano*, 224 F.3d 1030, 1032-33 (9th Cir. 2000)
(describing the facial challenge addressed in *Lingle*).

that the Palazzolo land was in Rhode Island[9] and the Guggenheim land was in California.

Tellingly, the majority opinion provides no justification or legal support for why these proposed distinctions matter. Why should the investment-backed expectations of a land owner bringing a facial challenge be analyzed differently from those of an as-applied claimant? If the *expectations* are valid and are expropriated, what does it matter as to their existence that they will be injured in all cases (facial challenge) or just in some (as-applied challenge)? Either they are valid expectations, or they aren't. Likewise, the majority opinion provides no justification, legal or otherwise, for limiting the broad language of *Palazzolo* to the type of transaction that vests title.

But this misprism of Supreme Court precedent is made worse by the majority opinion's failure to recognize specific evidence of the Guggenheims' investment-backed (after all, the Guggenheims invested money to buy the property) expectations. As the Court noted in *Palazzolo*, a court should analyze the claimant's investment-backed expectations as if the regulation at issue could be repealed at any time. *Id.* at 637. Here, the Guggenheims purchased the mobile home park with the apparent belief they could free the land from the Ordinance, either through administrative action, political lobbying, or court action. After buying the property in 1997, they applied for a variance from the zoning commission, which variance could exempt their land from the Ordinance.[10] The

---

[9]Where he was up against a more formidable and resourceful takings opponent: the State of Rhode Island and Providence Plantations. Here, the Guggenheims face the town of Goleta.

[10]Although the Guggenheims did not need to seek a land-use variance to bring their facial challenge to the Ordinance, *see Sinclair Oil Corp. v. Cnty. of Santa Barbara*, 96 F.3d 401, 406 (9th Cir. 1996), the fact that they applied for such a variance immediately after purchasing the mobile home park is objective evidence that they had at least some investment-backed expectations they could free the land from the Ordinance. Reference to such administrative action is made to strengthen that prong of the Guggenheims' regulatory taking claim, and should not suggest any uncertainty as to whether this is an as-applied or facial challenge; this is indisputably a facial challenge.

application was denied. They subsequently instituted this court action to have the Ordinance declared facially unconstitutional under the Fifth Amendment.[11]

The majority opinion even acknowledges the possibility of rent control repeal or reform by conceding that "[t]he Guggenheims might conceivably have paid a speculative premium over the value that the legal stream of rent income would yield, on the theory that rent control might someday end, either because of a change of mind by the municipality or court action." Maj. Op. at 20435. But, the majority dismisses this contention as a "speculative possibility, not an 'expectation,' " *id.* at 20435, without any citation of authority as to why a "speculative possibility" is not an expectation, nor why a judge, not a jury, should determine whether there was such an "expectation." The majority opinion flatly states (without a citation to any case, statute, or even a law review article) that "speculative possibilities of windfalls do not amount to 'distinct investment-backed expectations,' unless they are shown to be probable enough materially to affect the price." *Id.* at 20435. However, this self-supporting, self-defining language ignores the actual dictionary definition of "speculate."

---

[11]The Guggenheims' complaint contains further description of their efforts to contest the validity of the rent control ordinance and prevent its application to their mobile home park.

> Prior to the incorporation of the City, Plaintiffs unsuccessfully attempted to meet with City officials-elect to discuss the City's adoption of the mobilehome rent control provisions of the Orindance [sic]. In addition, Plaintiffs caused to be sent to the City Attorney-elect, a proposed ordinance that stayed the City's enforcement and the effectiveness of the newly adopted Ordinance relating to the vacancy control provision of mobilehome rent control and specifically the limitation of the adjustment of rents upon the sale of a mobilehome, i.e., vacancy control. Plaintiffs applied to the City for relief from the vacancy control restriction in the Ordinance. . . . Defendant's City Council considered adoption of the proposed moratorium and rejected it.

Guggenheim Complaint at ¶¶ 6-7.

As defined by Webster's New 20th Century Unabridged Dictionary (1979), one meaning of "speculate" is precisely "to buy or sell *land* hoping to take advantage of an *expected* rise or fall in price." (emphasis added). Having determined that they might be able to free their mobile home park from the Ordinance, the Guggenheims bought the land based on these investment-backed expectations—expectations which influenced the price they were willing to pay for the property as well as their expected rate of return on the investment.

The Guggenheims' beliefs regarding the possibility of freeing their land from the Ordinance were not self-indulgent delusions, or "starry eyed hope of winning the jackpot if the law changes," as the majority terms it. Maj. Op. at 20435. Their beliefs were at least plausible in light of contemporary legal, political, and academic thought. In the modern economic marketplace, the spectre of legal uncertainty haunts every commercial transaction and influences each party's valuation of the assets involved. For example, the validity of a pharmaceutical company's patent will affect that company's value as a potential acquisition target. Legal uncertainty over rent control has been particularly marked in California. In 1989 the state amended its Mobilehome Residency Law to exempt all *new* construction from local control. Cal. Civ. Code § 798.45. Less than two years before the Guggenheims purchased their property, California had abolished vacancy control for rental apartments statewide. Costa-Hawkins Rental Housing Act, § 1, 1995 Cal. Legis. Serv. 331 (A.B. 1164) (West) (codified at Cal. Civ. Code § 1954.50-.53). In January 1999, Santa Monica reformed its strict rent control ordinance, repealing its operation as to any *new* tenants. Tierra Properties, *Santa Monica: A Case Study in Growth and Rent Control* (1999).

The Guggenheims and the prior owners of their mobile home park may have reasonably thought that the state would abolish rent control—or at least vacancy control—for mobile home parks. And the Guggenheims could reasonably retain

those expectations today, as recent efforts to repeal rent control in California have garnered significant support. For example, a 2008 ballot proposition to phase out rent control won almost 40% of the votes cast. Patrick McGreevy, *Prop. 98 Backers Seek Eminent Domain Limits*, L.A. Times, June 5, 2008, at 1.

Moreover, mobile home rent control ordinances have been heavily criticized in academia as an inefficient method for providing affordable housing to low and middle-income households. *See, e.g.*, Mason & Quigley, 16 J. Housing Econ. at 192, 205 (concluding that "housing is no more "affordable" [to subsequent tenants] afterwards than it was before the ordinance was adopted," and that "virtually all of the economic benefits from lower regulated rents are paid out annually to finance the higher sales prices commanded by those dwellings").

Given the instances of actual or attempted repeal and reform of rent control ordinances across the country, the particular scrutiny paid to the issue in California, and the criticism of mobile home rent control in the academic literature, the Guggenheims had a reasonable expectation—or at least, a trier of fact could reasonably find they had such an expectation—that they could free their land from the Ordinance either through the grant of a zoning variance, political action targeted toward repealing the regulation in its entirety, or court action to invalidate the law. This inference is supported by evidence presented to the district court that the Guggenheims pursued relief from the Ordinance through at least two of these avenues in the years following their purchase of the mobile home park. The majority readily *admits* that this investment-backed expectation could have materially affected the price the Guggenheims were willing to pay for the mobile home park. "The Guggenheims might conceivably have paid a slight speculative premium over the value that the legal stream of rent income would yield, on the theory that rent control might someday end, either because of a change

of mind by the municipality or court action." Maj. Op. at 20435. At most, this concession establishes that the Guggenheims *did* in fact have investment-backed expectations of freeing the land from the Ordinance; at the very least, it raises a question of fact for the jury to decide.

Finally, the majority, perhaps sensing its vulnerability on the issue of investment-backed expectations, attempts to distract the reader by introducing an entirely irrelevant consideration into the analysis: the alleged investment-backed expectations of the mobile home *tenants*. Maj. Op. at 20437. The majority opinion paints a sympathetic portrait of subsequent tenants who purchased mobile homes at market rates, in reliance on the continued validity of the Ordinance. But, the *Penn Central* regulatory taking analysis does not apply to them for the simple reason that no government action took economic value from them or would take such value from them were the Goleta ordinance held invalid. The Takings Clause prohibits only takings, without compensation, by *government* action, not losses from the workings of the free market. *See Madera Irrigation Dist. v. Hancock*, 985 F.2d 1397, 1403 (9th Cir. 1993) ("Reasonable expectations arising out of past policy but without a basis in cognizable property rights . . . . cannot give rise to a [taking]."). *Moreover, Penn Central* does not contemplate any consideration of the expectations of other market players, or any balancing of the interests of various market players in determining whether the government has taken property. Its analysis is focused solely on the investment-backed expectations of the claimants, here, the Guggenheims.

In sum, the majority opinion ignores Supreme Court precedent by holding that a claimant cannot have investment-backed expectations if he purchases property with notice of an existing regulation, by assuming the eternal regnancy of a land-use regulation, and by introducing irrelevant considerations which tend only to confuse the regulatory taking analysis. Furthermore, the majority adopts a static and somewhat

simplistic view of law, politics, and economics by failing to recognize that the Guggenheims had a reasonable expectation of freeing their land from the Ordinance through political or legal means, and by failing to acknowledge that this belief could influence the price they were willing to pay for the land.

The Guggenheims presented sufficient evidence to raise a triable issue of fact regarding their investment-backed expectations to survive a motion for summary judgment. The case should have gone to trial.

### C. The Character of the Government's Action

The majority opinion also ignores the final *Penn Central* factor, the character of the governmental action, which likewise cuts in favor of the Guggenheims. In analyzing this factor, a court looks at the purpose of the regulation, the effect it has in practice, and the distribution and magnitude of the burdens and benefits it places on private citizens. *Penn Central*, 438 U.S. at 130-34.

The stated purpose of Goleta's mobile home rent control ordinance was to protect "owners and *occupiers* of mobile-homes from unreasonable rents" brought about by a shortage of housing and the high cost of moving mobile homes. Ordinance § 11A-1 (emphasis added). Rent control measures also have the claimed ancillary benefit of allowing stable communities to form. *See* Jay M. Zitter, *Validity, Construction, and Application of Inclusionary Zoning Ordinances and Programs*, 22 A.L.R.6th 295, § 13 (2007). However, as discussed below with regard to the substantive due process claim, this Ordinance does not serve its stated purposes because of the way it is structured and written. The Ordinance restricts only the amount the landowner can charge a tenant for rental of the mobile home parcel; it does not limit the amount which that tenant, in turn, can demand for sale or lease of the mobile home to other owners or tenants. The designed structure and working of the ordinance amounts to nothing more than a

wealth transfer from the landowner to the original tenant, and indisputably does nothing to curb housing costs or provide a stable population once the original tenant has sold or leased the mobile home.

The Ordinance unquestionably places a high burden on a few private property owners instead of apportioning the burden more broadly among the tax base. *See Armstrong v. United States*, 364 U.S. 40, 49 (1960) ("[The Takings Clause] was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole."); *see also Lingle*, 544 U.S. at 542-43; *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles*, 482 U.S. 304, 318-19 (1987). Similar laws concentrating the cost of affordable housing on a small group of property-owners have been found unconstitutional. In *Cienega Gardens*, developers of low-income apartments were able to secure low-interest, forty-year loans from private lenders because the Department of Housing and Urban Development provided the developers with mortgage insurance. *Cienega Gardens*, 331 F.3d at 1325. Two federal statutes eliminated the developers' contractual rights to prepay their forty-year mortgage loans after twenty-years. *Id*. at 1326-27. The purpose of the statutes was to prevent the developers from exiting the low-rent housing programs in which they were required to participate while carrying the loans, but not once they paid off the loans. *See id*. at 1323. But the statutes caused a 96% loss of return on equity for the developers. *Id*. at 1343. The developers brought suit against the government, claiming that the federal statutes restricting their right to prepay their mortgage loans effected a regulatory taking under the Fifth Amendment.

The Federal Circuit, applying *Penn Central*, found that the character of the government action was to place the expense of low-income housing on a few private property owners (those who had previously participated in the federal loan program but now wanted to pay their way out), instead of distrib-

uting the expense among all taxpayers in the form of incentives for developers to construct more low-rent apartments. *Id.* at 1338-39.

Similarly, here it is undisputed that the Ordinance applies only to mobile home park owners. The district court found that the City did not impose such extreme costs for providing affordable housing on any other property owners in the City, except as a condition of new development. In contrast to the burden of renting all the low-rent housing property at an 80% discount, the burden on new developers was to make only 20% of their housing available at below-market rates. There is nothing in the record to suggest why the Federal Circuit's reasoning should not be applied to the facts of this case; substituting "Goleta" for "Congress":

> Unquestionably, Congress acted for a public purpose (to benefit a certain group of people in need of low-cost housing), but just as clearly, the expense was placed disproportionately on a few private property owners. Congress' objective . . .—preserving low-income housing—and method—forcing some owners to keep accepting below-market rents—is the kind of expense-shifting to a few persons that amounts to a taking. This is especially clear where, as here, the alternative was for all taxpayers to shoulder the burden.

331 F.3d at 1338-39. This analysis, ignored by the majority opinion, weighs heavily in favor of finding a regulatory taking under *Penn Central*.

## D.    Weighing the *Penn Central* Factors Shows the Guggenheims Suffered a Regulatory Taking.

The majority opinion errs in considering only one element of a three-factor, balancing test—investment-backed expectations—and making that element dispositive. It treats

the factors as a requirements checklist, rather than a list of considerations to weigh, one against or with another. Further, it flouts the Supreme Court's holding in *Palazzolo* that a "pos-tenactment transfer of title [does not] absolve the [government] of its obligation to defend" the restrictions a regulation imposes on property-owners. *Palazzolo*, 533 U.S. at 627. At a *minimum*, the case should be remanded for trial on the severity of the economic impact on the claimants, the existence of investment-backed expectations, and the character of the governmental action because these are at least mixed questions of fact and law on which reasonable triers of fact could find that there was a taking. The Guggenheims produced evidence from which a finder of fact could find that a taking had occurred: the Guggenheims bought the mobile home park with the reasonable expectation that they could free the land from the Ordinance either through a variance, repeal of the regulation, or through court action. They were forced to rent mobile homes at 20% of the current market rate, and sit by as incumbent mobile home owners captured a transfer premium averaging approximately 90% of the sale price of their mobile homes. On summary judgment, drawing all reasonable inferences in favor of the non-moving party, the district court erred in holding, as a matter of law, that the Ordinance was not a taking. *See Ventura Packers*, *Inc.*, 305 F.3d at 916.

## III.　Substantive Due Process Claim

The Supreme Court in *Lingle* clarified the difference between a challenge to a rent control ordinance as a regulatory takings claim and as a substantive due process claim, and affirmed the independent vitality of both theories.

> [The Takings Clause] is designed not to limit the governmental interference with property rights *per se*, but rather to secure *compensation* in the event of otherwise proper interference. . . . Due process violations cannot be remedied under the Takings Clause,

> because if a government action is found to be impermissible—for instance because it fails to meet the 'public use' requirement or is so arbitrary as to violate due process—that is the end of the inquiry. No amount of compensation can authorize such action.

*Crown Point Develop., Inc. v. City of Sun Valley*, 506 F.3d 851, 856 (9th Cir. 2007) (quoting *Lingle*, 544 U.S. at 537).

The majority opinion summarily dismisses the Guggenheims' substantive due process claim by noting that while the Ordinance may not perfectly accomplish its stated purposes, this court is bound by precedent establishing that rent control ordinances are rationally related to a legitimate state interest. Maj. Op. at 20439. The majority opinion even cites Justice Holmes's iconic language from *Lochner*: "The Fourteenth Amendment does not enact Mr. Herbert Spencer's Social Statics." *Id.* n.54. And the majority might be correct if this case involved a true rent control ordinance. But, at the very least, a rent control ordinance must control rents, and Goleta's ordinance does no such thing.

The stated purpose of the Ordinance was to protect "owners and occupiers of mobilehomes from unreasonable rents," with the hope that affordable housing would create a stable population. Ordinance § 11A-1. But, the Ordinance is so structured so that it cannot achieve its designated purpose. Instead of controlling the price of rental housing, the Ordinance restricts only the amount the landowner can charge for one component of the cost of rental housing: land rent. There are no limits on the amount the "windfall tenant" and his successors as tenants or owners can charge when he in turn sub-leases or sells the mobile home to future tenants; as the housing market improves (as it did between 1997 and 2002), he has every incentive to capture that transfer premium by leasing or selling the mobile home.[12] The district court found it undisputed

---

[12]Nor can it be argued that the future effects of the Ordinance should not be considered in the due process analysis. By providing for a 10% rent

that this transfer premium equaled approximately 90% of the current sale price of a mobile home in the Park. As soon as the "windfall tenant" leases or sells the mobile home at a premium, the stated purposes of the Ordinance are nullified: the lease or sale is at the market rate, and the turnover in tenants has already interrupted the stability of the population and the goal of "affordable" (non-market) housing.

Thus, the Ordinance does not effect rent control, but simply transfers wealth from a small group of land owners to a larger group of fortunate tenants. While the government has authority to tax or encumber citizens for the common good, it cannot violate individual rights merely to enrich a small, private interest group. As the Court held in *Citizens' Sav. & Loan Ass'n v. City of Topeka*, 87 U.S. 655 (1874):

> To lay with one hand the power of the government on the property of the citizen, and with the other to bestow it upon favored individuals to aid private enterprises and build up private fortunes, is none the less a robbery because it is done under the forms of law. . . .

*Id.* at 664. The burden of this wealth transfer is borne entirely by mobile park lot owners, whose property rights are taken from them based solely on the nature of their business. Owners of condominium complexes, houses, or apartment buildings are not regulated by the Ordinance, even though their rental rates will affect the overall housing market to a greater extent than mobile home owners. *See* Quigley, *supra*.

Our court has several times found a rent control ordinance that creates such windfalls for lucky tenants and does not

increase each time a mobile home is sold, the drafters of the Ordinance clearly contemplated the future effect of the rent control ordinance on future tenants, and this fact broadens the temporal scope of this court's review.

lower prices to be unconstitutional under the theory that it failed "substantially [to] advance a legitimate state interest." *See Chevron USA, Inc. v. Bronster*, 363 F.3d 846, 855-57 (9th Cir. 2004) (ordinance limiting the rent oil company could collect from gas station operators was unconstitutional because operators could sell their lease rights at a premium), *rev'd sub. nom. Lingle*, 544 U.S. at 545; *Richardson v. City & Cnty. of Honolulu*, 124 F.3d 1150, 1165-66 (9th Cir. 1997) (ordinance regulating condominium assessments that allowed condo sellers to capture value of the regulation by selling at a premium was unconstitutional). One panel went so far as to hold that "a [mobile home] rent control ordinance that does not *on its face* provide for a mechanism to prevent the capture of a premium is unconstitutional, *as a matter of law*, absent sufficient evidence of externalities rendering a premium unavailable." *Cashman v. City of Cotati*, 374 F.3d 887, 897 (9th Cir. 2004) (emphasis altered).

Of course, these were regulatory takings cases, and the Supreme Court in *Lingle* disapproved of the "substantially advances" theory as a means of bringing a *takings* claim. 544 U.S. at 540. But *Lingle* upheld the independent validity of substantive due process claims and held that ordinances creating a transfer premium might not advance a legitimate government interest. The Court indicated that the "substantially advances" test was a way to bring substantive due process claims:

> The 'substantially advances' formula suggests a means-ends test: It asks, in essence, whether a regulation of private property is *effective* in achieving some legitimate public purpose. An inquiry of this nature has some logic in the context of a due process challenge, for a regulation that fails to serve any legitimate governmental objective may be so arbitrary or irrational that it runs afoul of the Due Process Clause

*Id.* at 542; *see also Crown Point Dev., Inc.*, 506 F.3d at 856.

Also puzzling is the majority's assertion the Ordinance meets the legitimate purpose of alleviating the hardship to owners in the "costs of moving" mobile homes from the Goleta pads. Maj. Op. at 20439. Surely, the costs of moving a mobile home, from forklift to flatbed to "wide load" flags fluttering down the road to a new site, are the same if the mobile home is moved from a rent controlled lot or from a market controlled lot.

But perhaps what the majority means as the "costs of moving" is the increased land rent the mobile home owner may have to pay at the new location. What the majority overlooks, however, is that—unless the mobile home owner is one of the lucky original "windfall" tenants—the price he paid for his mobile home was jacked up by the present value of the difference between Goleta rent controlled land (lower) and market price rental land (higher). *See* discussion of Prof. Quigley's report, *supra* at p. 20445. If the present value of the difference between rent controlled and market land rentals is correctly reckoned in the market price of the mobile home, the only additional "costs of moving" to be incurred are indeed the costs of permits, trucking, possible damage to the unit, etc. But those costs would be incurred regardless whether the mobile home owners were moving from a rent controlled or a market rate lot. Thus, just as the Ordinance does not control rents—a point on which the majority agrees, Maj. Op. at 20438-39—it does not protect mobile home owners from the "costs of moving," properly reckoned.

The Guggenheims do not base their substantive due process claim on Economics 101 or Herbert Spencer. *See* Maj. Op. at 20439 & n.54. To the contrary: the Guggenheims presented *undisputed* evidence that the Ordinance—by design—creates transfer premiums which increase the sublet rental or sale price of mobile homes. Such transfer premiums raise the eventual price to a Goleta tenant or buyer so that notwith-

standing the Goleta-mandated lower regulated land rent he must pay, the combined cost of his land rent and mobile home sublease or purchase approximates the total housing price for similar mobile home use on unregulated land rentals outside of Goleta.

This evidence creates a genuine question as to whether the Ordinance is so ineffective at serving its stated public purpose of "providing affordable (low-cost) housing" that it is not rationally related to a legitimate state interest. Despite the great deference owed to legislative acts which do not implicate a fundamental right or suspect classification, Justice Holmes's quote from *Lochner* is not a talisman which protects all government regulations from examination and review, regardless of their structural integrity or effectiveness.

## IV.   Equal Protection Claim

The Guggenheims also argue that the Ordinance violates the Equal Protection Clause because it singles out mobile home park owners, as opposed to other sorts of housing providers, to bear the burden of an affordable housing program. This court has previously held that a mobile home rent control ordinance does not per se violate the Equal Protection Clause because it is rationally related to the legitimate public interest of promoting affordable housing. *Equity Lifestyle Props., Inc. v. Cnty. of San Luis Obispo*, 548 F.3d 1184, 1195 (9th Cir. 2008). *Equity Lifestyle* held that this is true even if the statute singles out mobile home owners such as the Guggenheims, does not increase the amount of available affordable housing, and "serve[s] the sole purpose of transferring the value of [the park owner's] property to a select private group of tenants." *Id*. at 1193. Such a naked transfer of wealth between two private actors, based solely on the manner in which individuals choose to use their land, violates the Equal Protection Clause. *Equity Lifestyle* should have been overruled by this en banc panel to bring our Equal Protection analysis into line with the Supreme Court's views as to takings and substantive due pro-

cess.[13] As we are an en banc court, we are not bound by the "law of the circuit" rule of *Miller v. Gammie*, 335 F.3d 889, 899-900 (9th Cir. 2003) (en banc).

We should reverse the district court's finding that there has been no compensable taking and no due process or equal protection violation, and remand for a trial on the merits.

---

[13]*Pennell v. City of San Jose*, 485 U.S. 1, 13-14 (1988), which held the rent control ordinance at issue in that case was rationally related to a legitimate state interest is not contrary to our reasoning because *Pennell* involved a true rent control ordinance of rental apartments. The old tenants in that case had no power to charge the new tenants a premium over the rent controlled amount. Thus, the rent control ordinance was effective in carrying out the goal of providing affordable housing. Again, if our case involved a true rent control ordinance that was designed to be effective in attaining its goals, I would not dissent from the majority's conclusion that the Ordinance does not violate substantive due process or equal protection.